[Cite as *Prokos v. Hines*, 2014-Ohio-1415.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

LAISA PROKOS, :
:
    Plaintiff-Appellee, : Case Nos. 10CA51
: 10CA57
    vs. :
:
PAM HINES, ET AL., : DECISION AND JUDGMENT
: ENTRY
    Defendants-Appellees. :
: **Released: 03/28/14**
_____

:
LAISA PROKOS, :
:
    Plaintiff-Appellee, :
:
    vs. :
:
DEMETRIOS PROKOS, ET AL., :
:
    Defendants-Appellees, :
:
    and :
:
NICKOS PROKOS, ET AL., :
:
    Defendants-Appellants. :
_____
APPEARANCES:

L. Jackson Henniger, L. Jackson Henniger & Assoc., Logan, Ohio, for
Appellants Barry M. Kucik, Barry M. Kucik, Trustee of the Kucik
Revocable Living Trust, and Barry M. Kucik, P.A., a Florida Profit
Corporation.

John P. Lavelle and Robert R. Rittenhouse, Lavelle and Associates, Athens, Ohio, for Appellee Demetrios Prokos.

Jeffrey L. Finley, Eachus & Finley Law Offices, Gallipolis, Ohio, Fiduciary for the Estate of Laisa Prokos.
_____

McFarland, J.

{¶1}  In appellate case number 10CA51, Defendant Nickos Prokos and Defendants Barry M. Kucik, Barry M. Kucik, Trustee of the Kucik Revocable Living Trust, and Barry M. Kucik, P.A., a Florida Profit Corporation ("Appellants") appeal the October 7, 2010 journal entry of the Athens County Common Pleas Court adopting the settlement agreement between the estate of Laisa Prokos and Demetrios Prokos.  In appellate case number 10CA57, Appellants further appeal various judgment entries of the Athens County Common Pleas Court, attached to the notice of appeal as Exhibits A-1 through A-6, and captioned as follows:

> A-1-Judgment entry on post trial motions dated November 22, 2010;

> A-2-Journal entry adopting settlement agreement between Estate of Laisa Prokos and Demetrios Prokos dated October 7, 2010;

> A-3-Journal entry regarding defendants' claims of jury irregularity dated September 23, 2010;

> A-4-Journal entry on proposed settlement dated September 23, 2010;

> A-5-Journal entry regarding pre-trial motions dated September 23, 2010; and,

A-6-Judgment entry dated May 27, 2010.

{¶2} Upon review of the record, we find no error in the trial court's judgment. As such, we overrule all of the assignments of error presented by Appellants.

FACTUAL AND PROCEDURAL BACKGROUND

{¶3} These consolidated lawsuits technically arose subsequent to the January 2004 filing of a mechanic's lien by Demetrios Prokos against rental properties located in Athens, Ohio, and owned, at one time, by his parents, Vasilios and Laisa Prokos.  The consolidated actions culminated in a six-week jury trial in the Athens County Court of Common Pleas in 2010. Based upon the facts adduced in evidence and the jury's verdict, it would appear that Laisa Prokos was a victim of her younger son Nickos Prokos' incessant scheming to obtain money to support an ostentatious lifestyle.  It also appears that Laisa Prokos was the victim of Florida attorney, Barry Kucik, who aided and enabled Nickos to receive large and unverifiable amounts of money while purporting to transfer ownership of Laisa's properties to himself.  The underlying backdrop to this litigation is poignant and lengthy.

{¶4} Vasilios and Laisa Prokos (hereinafter "Vasilios and Laisa") were Greek immigrants who arrived in Athens County, Ohio in 1974.  The

Prokoses had three children: Demetrios Prokos (hereinafter"Demetrios"),

Pam Hines (hereinafter "Pam"), and Nickos Prokos (hereinafter "Nickos").

Vasilios and Laisa opened a sandwich shop, Souvlakis, and purchased

various properties and rental properties (hereinafter "the properties") in

Athens. The properties subject of these proceedings were located at 9 W.

State Street; 186 W. Washington Street; 208 W. Washington Street[1]; 6

Brown Street; 48 Moore Street; 120 N. Congress Street; and 45 Mound

Street.  In their later years, Vasilios and Laisa spent time between homes in

Athens, Ohio and Florida. Nickos also resided separately in Florida.  Pam,

Demetrios, and Pam's daughters Natalie (Williams) Bowles, (hereinafter

"Natalie") and Tracy Hines ("Tracy"), resided in Athens. Vasilios relied on

Demetrios to manage his rental properties in Ohio. Demetrios testified

beginning in 1996, he had an agreement with his father to manage the rental

properties and be compensated.  Vasilios died October 11, 2003.  Laisa

remained in Florida with Nickos, who moved in with her.

{¶5} After his father's death in 2003, Nickos assisted in his mother's

business affairs. Laisa's contact and relationships with Demetrios, Pam,

Natalie, and Tracy deteriorated.  Meanwhile, Laisa was surrounded by

---

[1] The 208 W. Washington Street property was also referred to during trial as 208 ½ W. Washington Street.

Nickos, her Greek-speaking friends Alieke Mandros ("Alieke") and Thomas Mandros, and Barry Kucik. Alieke often acted as an interpreter for Laisa.

{¶6} The testimony at trial revealed that at the time of her husband's death and her own declining health, Laisa was approximately 70-years-old, had a third-grade education received in Greece during WWII, vision problems, and spoke only broken English. She had never obtained a driver's license. Laisa also had multiple health problems including diabetes, heart conditions, and scleroderma of the lungs. She used a wheelchair at times. During this time period, it appears Laisa may have believed she was in dire financial circumstances.

{¶7} The evidence at trial revealed that within two weeks of Vasilios' death, Laisa began changing her estate plans, from those made earlier in 2001. Alieke assisted Laisa, in a wheelchair, to Barry Kucik's office. Laisa eventually executed three different sets of estate planning documents. The first set (November 2003) disinherited Pam and Demetrios. The second set (December 2003) disinherited her grandchildren. The third set (April 2004) disinherited everyone but Nickos.[2] In the event of Nickos' predecease, Laisa

---

[2] Although the record revealed Laisa had been at odds with Demetrios, Pam, and Natalie at times, there was no evidence of any discord with Tracy, or reason for disinheriting Tracy.

directed half of her estate go to Alieke and half be distributed to the Greek church.[3]

{¶8} Nickos sought control of the Athens rental properties. Natalie testified she had become concerned that Laisa was not getting business documents properly translated to her. Natalie testified her grandmother had a good mind, but Natalie thought she was being controlled. Natalie and her children visited Laisa over Thanksgiving weekend 2003 to check on her. As Natalie was leaving for Ohio on December 1, 2003, Nickos routed her to Barry Kucik's office to sign documents. Natalie testified the documents were laid out on a table, already notarized. Despite feeling somewhat uncomfortable about signing, Natalie did so. [4]

{¶9} Demetrios relinquished management and control of the properties in December 2003. He had suspicions about Nickos' handling of his mother's business affairs and properties. On January 16, 2004, Demetrios recorded a mechanic's lien on the properties. In the affidavit for mechanic's lien, Demetrios avowed he was owed the sum of $333,880.00 for labor, work, and materials furnished from June 1, 1995 to December 31, 2003. He also filed an affidavit of facts relating to title, describing the

---

[3] A fourth set of estate planning documents was executed by Laisa in November 2004. These were prepared by a Greek-speaking Florida attorney, Attorney Tsmoutales. There was no evidence in the record to indicate any collusion between Attorney Tsmoutales and Nickos or Barry Kucik.
[4] Via these documents, Natalie was given a limited power of attorney to assist in managing the Ohio rental properties. Nickos was given a power of attorney to receive information on behalf of Laisa.

contract he alleged to have made with his father and the terms of the contract. Essentially, Demetrios claimed to have a contractual right of first refusal and option to purchase his parents' properties.[5] Demetrios was never able to produce a written contract.

{¶10} Immediately after the mechanic's lien was filed, Attorney Barry Kucik encouraged Laisa to file suit against Demetrios and Pam. William Biddlestone, Laisa's Ohio lawyer, filed the underlying actions which were later consolidated.[6] The claims against Demetrios related to the mechanic's lien. Demetrios and Pam then filed claims against Nickos alleging fraud and intentional interference with expectancy of inheritance. In May 2005, Demetrios filed a counterclaim for foreclosure of the mechanic's lien against Laisa. He sought judgment for the value of the mechanic's lien and a decree of foreclosure of the real estate subject to the lien.

{¶11} In May 2005, Laisa traveled to Ohio to testify at a hearing about Vasilios' estate.[7] The testimony at trial characterized those traveling

---

[5] The mechanic's lien and affidavit of facts relating to title also included two properties not subject of these proceedings. Demetrios subsequently filed documents to correct parcel numbers listed on the mechanic's lien and affidavit of facts.

[6] The lawsuits were captioned: *Laisa Prokos v. Pam Hines*, et al., Athens County Common Pleas Court case number 04-CI-078 and *Laisa Prokos, v. Demetrios Prokos,* et al., Athens County Common Pleas Court case number 04-CI-103.

[7] There had been some dispute as to whether the estate should have been administered in Ohio or Florida. Natalie had been named fiduciary of her grandfather's estate. After Natalie returned from the Thanksgiving 2003 trip to Florida, she sent several requests to Barry Kucik requesting the return of her grandfather's will. She also received a letter from Kucik directing her to resign as fiduciary. The testimony at trial showed Kucik engaged in "obstructionist" actions in his involvement with Vasilios' estate administration.

with her as an "entourage": Nickos, Alieke, Barry Kucik, and Steve Savvides (a security officer). The group flew from Florida to Columbus, Ohio, and then drove to Athens in multiple vehicles. Demetrios and Natalie testified the "entourage" was simply a way of further isolating Laisa from the rest of her family. Natalie and Demetrios testified Laisa had been blocked from receiving their calls.[8] They both testified on the day of the court hearing, when Natalie and her children presented Laisa with flowers, Nickos grabbed them from her hands and threw them into the trash in front of everyone.

{¶12} Concerning the alleged fraudulent conveyance of Laisa's property, at issue in the 2010 trial, the testimony and exhibits revealed Laisa's 7 rental properties were conveyed to the Kucik Defendants via two separate real estate transactions. The first transaction involved a contract for sale and purchase between Laisa and Barry Kucik for three properties: 186 W. Washington Street, 208 W. Washington Street, and 9 W. State Street (Souvlakis). Laisa signed a contract prepared by Kucik on June 16, 2004. She also signed warranty deeds. Kucik paid somewhere between $193,000.00 and $213,000.00 total for the three properties. Allegedly pursuant to Laisa's instructions, Kucik did not record the deeds. Both Barry

---

[8] Natalie testified that Mother's Day 2004 gifts sent to Laisa were returned unopened. Demetrios testified he went to visit his mother 7-8 times after his father died and was denied access. Both Demetrios and Natalie received letters directing them to refrain from contact with Laisa, drafted by Barry Kucik.

Kucik and Nickos testified Laisa was afraid for Demetrios to find out about the sale.

{¶13} The second real estate transaction disposed of Laisa's remaining 4 rental properties:  6 Brown Street, 48 Moore Street, 45 Mound Street, and 120 N. Congress Street.  The agreement for this sale was dated June 15, 2005.  On this date, Laisa was hospitalized due to her lung condition.  Nickos signed as grantor pursuant to his unrecorded power of attorney.  Nickos testified he discussed the transaction with her and she was happy.  She knew he was signing on her behalf.  One hundred thousand dollars was paid directly to Nickos on June 21, 2005, pursuant to another document Laisa signed and Kucik drafted, directing that this money be paid directly to Nickos if received after her demise.

{¶14} Regarding Nickos' execution of the final deeds, Joann Alcott, an employee of Sun Trust Bank, near Kucik's law office, testified via deposition at trial.  Barry Kucik was her customer.  Ms. Alcott testified in the past she had met Laisa and it was obvious Laisa was not physically able to care for her business affairs, although she could converse.  Ms. Alcott recalled Laisa was not with Nickos when he brought the quitclaim deeds to be notarized on June 29, 2005.  Nickos signed the deeds as Laisa's power of attorney.  He did not explain why he was doing so, but Ms. Alcott saw no

"red flags." Ms. Alcott testified she did not ask about Laisa, but she had no reason to believe Laisa was physically or mentally incapacitated at the time. Ms. Alcott was forced to admit error on her part when she was directed to the "acknowledgement" section of the deed, which indicated Laisa was in her presence. Ms. Alcott also testified that Barry Kucik may have been present with Nickos on the 29th. Laisa died on June 29, 2005.

{¶15} Nickos testified he did not know his mother was near death. Despite medical records which indicated otherwise, Nickos denied being informed that her medical conditions were progressive or that hospice had been recommended. He denied attempting to effectuate the second real estate transaction knowing she was near death. Nickos testified he saw Laisa around 3:00 p.m. at the hospital and she was perfectly fine. Nickos left the hospital to deliver the deeds to Barry Kucik. Kucik also testified he saw Laisa twice during her last hospitalization and had no idea her death was imminent.

{¶16} Nickos gave conflicting testimony at trial as to the delivery of the quitclaim deeds, testifying one day he handed the deeds to a receptionist and testifying the very next day he placed them on a shelf in Kucik's law office. Nickos received the $100,000.00 directly. Kucik testified he provided money to Nickos through the fall of 2005. He did not know how

much money went to Laisa or Nickos for the second real estate deal. The

quitclaim deeds were not recorded until July 2005. The deeds had multiple

mistakes which Nickos corrected on his typewriter.

{¶17} According to Barry Kucik, Laisa thought she'd soon be "out on

the street" because of Demetrios' mechanic's lien. She was desperate for

money and Kucik offered to help. Kucik never obtained an appraisal, a title

search, or an inspection of the properties. Nickos testified he explained their

financial situation to his mother and she believed the sales were "like a land

contract." Nickos testified Laisa was competent and understood. According

to Nickos, Laisa had no reservation about Barry Kucik and "because he was

an attorney, she trusted him even more."

{¶18} Sometime after Laisa died, Barry Kucik, individually and as

Trustee of the Kucik Revocable Living Trust recorded multiple deeds in the

Athens County Recorder's Office. These deeds purported to convey to the

Kucik Defendants Laisa's rental properties. Because Barry Kucik paid

Nickos directly, none of this money from the second real estate deal went to

her Estate.

{¶19} Laisa's estate was eventually opened in Ohio. It was insolvent.

Although there was evidence that Vasilios may have had a $250,000.00 life

insurance policy, no such money was received by Laisa or made part of her

estate. Prior to her death, Laisa had given $49,000.00 to Barry Kucik to forward to William Biddlestone, to purchase another Ohio property on Laisa's behalf. The money had been held in Kucik's client trust account and was forwarded to Biddlestone for deposit in his client trust account. After Laisa's death, Biddlestone returned this money to Barry Kucik instead of forwarding it to her estate, the estate fiduciary, or the appropriate court. Kucik placed the $49,000.00 in his private account and it never became part of Laisa's estate. There was also evidence that Laisa sold property owned in Greece and received approximately $25,000.00 cash sometime during the last year of her life. This money was not paid to Laisa's estate or her fiduciary. The evidence also demonstrated that approximately $7,100.00 had been paid for rent on Souvlakis restaurant, shortly before Laisa died. Approximately $5,000.00 of this money was forwarded to Nickos by Attorney Biddlestone and was also never made part of the Estate.

{¶20} Attorney Biddlestone gave lengthy testimony at trial. He and his wife oversaw Laisa's Ohio rentals beginning in March 2004. In September 2004, he and his wife traveled to Florida to meet Laisa and discuss the lawsuits he had filed on her behalf. Biddlestone testified Laisa seemed engaged with her friends. She was in a wheelchair mostly, surrounded by friends and caregivers.

**{¶21}** Attorney Biddlestone testified he was never asked to review any of the agreements between Laisa and Barry Kucik. He testified he had some concerns about her relationship with Kucik. He opined Kucik was too financially involved with his client. Biddlestone believed Laisa needed independent, Greek-speaking counsel in Florida.

**{¶22}** Due to the glaring irregularities with regard to the transfer of Laisa's properties to the Kucik Defendants, these defendants were joined in the lawsuits. In June 2007, Demetrios amended his Complaint against Nickos and the Kucik Defendants, setting forth claims for fraudulent conveyances and fraud. The Estate of Laisa Prokos also amended its Complaint to include claims against Nickos and the Kucik Defendants for fraud and conversion. The Estate sought compensatory damages, punitive damages, and an order rescinding the fraudulent conveyances.

**{¶23}** The Kucik Defendants filed counterclaims against Demetrios. The parties engaged in motion practice. Eventually, Appellants' counterclaims against Demetrios were dismissed via summary judgment.

**{¶24}** On September 21, 2009, by agreement of all parties, the trial court issued a journal entry trifurcating the claims and scheduling three trials. It was agreed the first trial would concern the allegations of fraud, intentional interference with expectancy of inheritance, and the Estate's tort

claims. The second trial would deal solely with Demetrios' mechanic's lien claims. The third trial was to resolve the remaining tort and contract claims.

{¶25} The first trial began on March 31, 2010. The jury heard six weeks of testimony. In closing, counsel for Demetrios argued the claims for fraud, interference with inheritance, and fraudulent transfer had been proven. Counsel pointed out the various inconsistencies in Nickos and Barry Kucik's testimony and with the documentary evidence. Counsel questioned "Who was looking out for this woman?" Counsel suggested when Laisa presented to Kucik's office, scared about her finances and fearing displacement from her residential home, Barry Kucik, as an attorney, financial planner, and CPA had a duty to review the rents, mortgages, her finances, and advise her accordingly. Counsel also argued the deeds were never legally delivered before Laisa's death.

{¶26} Counsel for the Estate also pointed out the inconsistencies in the testimony. Counsel pointed out that Barry Kucik had admitted committing fraud upon Nickos' prior counsel, Attorney Scyld Anderson.[9] Counsel argued not only were the deals kept secret from Demetrios and the rest of the world, but the deals were also kept secret from Laisa. Counsel requested the properties and $49,000.00 be returned to the Estate.

---

[9] This deceptive conduct will be discussed infra.

**{¶27}** Counsel for the Kucik Defendants argued Kucik's conduct was confusing, but that Laisa was not mistreated, helpless, or incapable of making her own decisions. Counsel argued Kucik had poor judgment and poor draftsmanship of the relevant documents and deeds, but he was being "vilified" for attempting to help Laisa. Counsel argued the value of the rentals had been destroyed by their poor condition, heavy mortgages, and Demetrios' mechanic's lien, and that Laisa had received reasonable value.

**{¶28}** Counsel for Nickos argued Demetrios had no right to expect to inherit from Laisa after the way he had terrorized her.[10] Nickos' counsel directed the jury to pay attention to the video showing Laisa had executed documents and expressed her desire to disinherit Demetrios and others.

**{¶29}** The jury deliberated three days, reaching a verdict on May 14, 2010. The jury found in favor of the Estate of Laisa Prokos on the fraud and conversion claims, and against Nickos and the Kucik Defendants. The Estate was awarded $350,000.00 in compensatory damages against Nickos and a $750,000.00 award for punitive damages. The Estate was awarded $49,000.00 in compensatory damages against the Kucik Defendants. It was also awarded $300,000.00 in punitive damages.

---

[10] Nickos testified Demetrios had terrorized his parents before Vasilios' death in 2003, waving a gun and insisting they transfer the properties to him. Nickos also testified Demetrios upset Laisa by thwarting her wishes as to Vasilios' burial.

**{¶30}** The jury also found in favor of Demetrios on his fraud and fraudulent conveyance claims, and against Nickos and the Kucik Defendants. The jury also found in favor of Demetrios on the intentional interference with expectancy of inheritance claim against Nickos, but found in favor of the Kucik Defendants as to this claim. The jury awarded Demetrios $200,000.00 in compensatory damages against Nickos and $500,000.00 in punitive damages. Demetrios was also awarded $5,000.00 in compensatory damages against the Kucik Defendants on the fraud and fraudulent conveyance claims.

**{¶31}** On May 27, 2010, the trial judge issued a judgment entry which voided the deeds which conveyed Laisa's interest in the Athens properties to the Kucik Defendants and ordered the property returned to her Estate. Thereafter, Demetrios and the Estate reached a settlement regarding the mechanic's lien. The settlement was subsequently approved by both the Athens County Probate Court and the Athens County Court of Common Pleas. The second phase of trial was then rendered unnecessary and was cancelled.

**{¶32}** The trial court also issued a judgment entry on post-trial motions on November 22, 2010. The entry ordered the objections of Nickos

and the Kucik Defendants be overruled and it upheld the jury verdict.

Demetrios and the Estate's attorney were also awarded attorney fees.

{¶33} Nickos and the Kucik Defendants filed timely notices of appeal

and the appeals were consolidated herein.  Subsequently, Demetrios, Nickos

and the Estate reached a settlement and the third phase of trial did not occur.

Nickos has since died.   Where relevant, additional facts adduced at trial will

be set forth more fully below.

ASSIGNMENTS OF ERROR[11]

I.      THE TRIAL COURT ERRED WHEN IT OVERRULED THE
        KUCIK DEFEDANTS' AND NICKOS PROKOS' MOTIONS FOR
        JUDGMENT NOTWITHSTANDING THE VERDICT FOR ALL OF
        THE REASONS ASSERTED IN THIS BRIEF REGARDING THE
        LAW AND FACTS, BUT ESPECIALLY BY REASON OF THE
        TRIAL COURT LACKING SUBJECT MATTER JURISDICTION
        OVER (i) ALL CLAIMS ASSERTED AGAINST KUCIK
        DEFENDANTS AND (ii) ALL CLAIMS OF FIDUCIARY
        AGAINST DEMETRIOS PROKOS.

II.     THE TRIAL COURT ERRED IN GRANTING DEMETRIOS
        PROKOS' MOTION FOR SUMMARY JUDGMENT.

III.    THE TRIAL COURT ERRED IN SUBMITTING THE CLAIM OF
        FRAUDULENT CONVEYANCE TO THE JURY WITHOUT
        PROOF OF THE VALIDITY OF CLAIMANT'S CLAIM, AND IN
        INSTRUCTING THE JURY TO CONSIDER THE CLAIM.

IV.     THE TRIAL COURT ERRED IN MAKING ITS EVIDENTIARY
        RULINGS THAT NEITHER PARTY COULD ADDUCE
        EVIDENCE BEYOND SOME MINIMAL AMOUNT TO PROVE

---

[11] The assignments of error have been re-numbered as they were not properly numbered in Appellants',
brief.

OR DISPROVE THE VALIDITY OF THE MECHANIC'S LIENS. THE EVIDENTIARY RULINGS WERE MADE DURING THE TESTIMONY OF DEMETRIOS PROKOS AND DURING THE PRESENTATION OF THE KUCIK DEFENDANTS AND NICKOS PROKOS CASES.  THE KUCIK DEFENDANTS EXHIBITS IN REGARD THERETO WERE PROFFERED.

V.   THE TRIAL COURT ERRED IN TRIFURCATING THE TRIAL INTO THREE PHASES, THE "PERSONAL CLAIMS" OF DEMETRIOS AND OTHERS, EXCEPT NICKOS PROKOS FOR PHASE 3, THE MECHANIC'S LIENS FOR PHASE 2, AND ALL OTHER CLAIMS, BASICALLY CONSISTING OF FRAUD CLAIMS, FRAUDULENT TRANSFER CLAIMS, FIRESTONE CLAIM, FOR PHASE 1.

VI.  THE TRIAL COURT ERRED TO THE PREJUDICE OF THE KUCIK DEFENDANTS, AND ANY JURY FINDING IS TAINTED THEREBY, IN SUBMITTED CLAIMS TO THE JURY THAT INCLUDED THE CLAIM OF FRAUDULENT CONVEYANCE.

VII. THE TRIAL COURT ERRED IN RULING AND PERMITTING THE JURY TO CONSIDER INCONSISTENT REMEDIES, IN THAT THE PREVAILING PARTIES SHOULD NOT BE PERMITTED TO GAIN TITLE TO THE SUBJECT REAL PROPERTIES FREE AND CLEAR OF MORTGAGES THAT HAD BEEN PAID BY THE KUCIK DEFENDANTS OR ONE OF THEM.

VIII. THE TRIAL COURT ERRED IN FAILING TO REQUIRE THAT CLAIMING PARTIES SHOULD NOT HAVE TO ELECT REMEDIES.  THE PREVAILING PARTIES SHOULD NOT HAVE BOTH THE PROPERTIES AND DAMAGES.

IX.  THE TRIAL COURT ERRED IN PERMITTING THE ESTATE FIDUCIARY JEFFREY FINLEY TO PROCEED IN TRIAL WITHOUT PROSECUTING THE ORIGINAL CLAIMS OF THE DECEDENT LAISA PROKOS AGAINST DEMETRIOS PROKOS, ET AL., AS SHE ORIGINALLY CLAIMED, THEREBY GIVING THE JURY THE FALSE IMPRESSION THAT THE CLAIMS OF DEMETRIOS PROKOS WERE MERITORIOUS WHEN ORIGINALLY LAISA PROKOS HAD ELECTED TO HAVE

THEM DETERMINED AS LACKING IN MERIT AND IN FACT HAD MADE CLAIMS AGAINST HIM.  THIS ERROR WAS TO THE SUBSTANTIAL PREJUDICE OF THE KUCIK DEFENDANTS.

X.      THE TRIAL COURT ERRED IN PERMITTING THE ESTATE FIDUCIARY JEFFREY FINLEY TO PROCEED IN TRIAL AS IF HE HAD NOT DENIED THE VALIDITY OF THE MECHANIC'S LIENS CLAIMS OF THE PLAINTIFF DEMETRIOS PROKOS IN HIS PLEADINGS, WHICH HE HAD, THEREBY GIVING THE JURY THE FALSE IMPRESSION THAT THE ESTATE WAS IN AGREEMENT WITH THE CLAIMS OF DEMETRIOS PROKOS AS WELL AS IN AGREEMENT WITH THE VALIDITY OF THE MECHANIC'S LIENS.

XI.     THE JURY FAILED TO GIVE PROPER WEIGHT TO THE PROPERLY TRANSLATED VIDEO OF THE DECEDENT LAISA PROKOS.

XII.    THE JURY FAILED TO GIVE PROPER WEIGHT TO THE OVERWHELMING EVIDENCE OF THE UNINFLUENCED WISHES OF THE DECEDENT LAISA PROKOS IN MAKING NEW WILLS WITH AN ATTORNEY WHOSE ETHICS AND PARTIALITY ONLY TO HIS CLIENT WHICH WERE NEVER PROVEN WANTING IN ANY WAY, THEREBY GIVING THE FALSE IMPRESSION TO THE JURY THAT THE DECEDENT WAS SUBJECT TO THE UNDUE INFLUENCE OF KUCIK DEFENDANTS AND DEFENDANT NICKOS PROKOS.

XIII.   THE TRIAL COURT ERRED IN GRANTING AN AWARD OF ATTORNEY FEES TO DEMETRIOS PROKOS AGAINST KUCIK DEFENDANTS BECAUSE HE DID NOT RECEIVE AN AWARD OF PUNITIVE DAMAGES AGAINST THEM.

XIV.    THE TRIAL COURT ERRED IN FAILING TO DECIDE BY CLEAR AND CONVINCING EVIDENCE, INDEPENDENTLY OF THE JURY,(WHICH ONLY MADE DECISIONS BY A PREPONDERANCE OF THE EVIDENCE), THAT THE TRANSFERS OF THE SUBJECT REAL PROPERTIES HAD BEEN

NULLIFIED, FOR ANY REASON OR BY REASON OF THE JURY'S INTERROGATORIES.

XV.   THE TRIAL COURT ERRED IN FAILING TO AWARD AN EQUITABLE LIEN TO KUCIK DEFENDANTS FOR THE MONEY PAID BY THEM FOR THE SUBJECT REAL PROPERTIES AND FOR SATISFACTION OF THE MORTAGES OF THEM.

XVI.  THE TRIAL COURT IN JUDGMENT ENTRY, FILED NOVEMBER 22, 2010, ERRED IN FAILING TO GRANT KUCIK DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND A NEW TRIAL, AND REMITTER FOR THE REASONS STATED IN THEIR MOTION THEREFOR, WHICH PRIMARILY ARE AS FOLLOWS:

A.  THE JURY INSTRUCTIONS AND THE EVIDENCE DO NOT SUPPORT THE COMPENSATORY DAMAGES AWARDED TO THE ESTATE ($49,000) AND DEMETRIOS PROKOS ($5,000);

B.  ASSUMING THE COMPENSATORY DAMAGES AWARD ARE VACATED, THEN BY STATUTE AND RELEVANT CASE LAW, THE PUNITIVE DAMAGE AWARD MUST BE VACATED;

C.  THE JURY INSTRUCTIONS WERE SUCH THAT THE TRIAL JUDGE FAILED TO COMPLY WITH APPLICABLE STATUTES IN ITS INSTRUCTIONS;

D.  ALL OF THE GROUNDS ASSERTED IN THE MOTIONS FOR DIRECTED VERDICT MADE AT TRIAL; AND,

E.  OTHER GROUNDS AS SET FORTH IN CIVIL RULES 50 AND 59 OR APPLICABLE STATUES.

XVII. THE TRIAL COURT ERRED IN RULING THAT THE KUCIK DEFENDANTS COULD NOT ADDUCE EVIDENCE OF THE FINANCIAL TRANSACTIONS BETWEEN VASIOLIOS PROKOS, FATHER OF DEMETRIOS PROKOS, AS EVIDENCE BY HUNDREDS OF PERSONAL AND BUSINESS CHECKS, (PROFFERED EXHIBIT ___), REGARDING THE LACK OF EVIDENCE SUPPORTING DEMETRIOS PROKOS' BASIS FOR

THE MECHANICS LIENS THAT HE FILED, WHICH IF THEY
HAD COME INTO EVIDENCE WOULD HAVE PROVED
DEMETRIOS PROKOS MECHANICS LIEN CLAIMS
BASELESS;THEREBY PRECLUDING RECOVERY UNDER THE
FRAUDULENT CONVEYANCE CLAIM.

XVIII.THE TRIAL COURT ERRED IN ITS JOURNAL ENTRY ON
PROPOSED SETTLEMENT, FILED SEPTEMBER 23, 2010, IN
FINDING OR ASSUMING THE VALIDITY OF THE
MECHANIC'S LIENS IN APPROVING A SETTLEMENT, POST
TRIAL, AND IN NOT HAVING A FACTUAL BASIS IN ITS OWN
COURT FOR SO ORDERING.

## STANDARD OF REVIEW OF CIVIL JUDGMENTS

{¶34} In reviewing a trial court's judgment, it is well established that
every reasonable presumption must be made in favor of the judgment and
findings of fact. *Shemo v. Mayfields Hts.,* 88 Ohio St. 3d 7, 722 N.E.2d
1018 (2000); *Seasons Coal Co., v. Cleveland,* 10 Ohio St. 3d 77, 461 N.E.2d
1273 (1984).

I. Assignment of Error One - Did the Athens County Court of Common
Pleas, General Division, have subject matter jurisdiction over the claims of
the parties herein?[12]

## STANDARD OF REVIEW

{¶35} The existence of the trial court's subject matter jurisdiction is a
question of law that we review de novo. *Tewksbury v. Tewksbury,* 4th Dist.

---

[12] At the outset, we note Appellants' assignment of error one also indicates, in addition to the primary argument that the common pleas court's general division did not have subject matter jurisdiction over the claims herein, that the trial court erred by overruling the Kucik Defendants and Nickos Prokos motions for judgment notwithstanding the verdict, for the reasons contained in the brief. Pursuant to *Grimes v. Grimes,* 975 N.E.2d 496, 2012-Ohio-3562, (4th Dist. 2012), we remark that though appellate courts have the option to address two or more assignments of error at once, the parties do not. *Grimes* at 15, Fn 4. We have declined to address this portion of assignment of error one, also, pursuant to App.R. 16(A)(7).

Pike No. 07CA771, 2008-Ohio-4600, ¶ 15, citing *State ex rel. ACCSEA v. Balch,* 4th Dist. Athens No. 06CA26, 2007- Ohio-7168, ¶ 22; *Yazdani-Isfehani v. Yazdani-Isfehani,* Athens No. 06CA6, 2006-Ohio-7105, ¶20, citing *State v. Moore,* 4th Dist. Highland No. 03CA18, 2004-Ohio-3977, ¶8, and *Burns v. Daily,* 114 Ohio App.3d 693, 701, 683 N.E. 2d 1164 (1996). Therefore, we do not grant any deference to the trial court's conclusion, *Tewksbury, supra,* citing *Balch* at ¶22.

## LEGAL ANALYSIS

{¶36} Appellants argue the Athens County Court of Common Pleas, General Division, had no jurisdiction over the claims against them asserted by the Estate of Laisa Prokos and Demetrios Prokos. Appellants' arguments against jurisdiction of the Athens County Common Pleas Court, general division, can be summarized as follows:

> 1) The claims regarding Laisa's inter vivos transfers to Appellants were under the exclusive jurisdiction of the probate court based on the law contained in *Grimes v. Grimes,* 975 N.E.2d 496, 2012-Ohio-3562 (4th Dist. 2012); *Johnson v. Johnson,* 4th Dist. Vinton No. 98CA519, 1999 WL 527753; and *Spitzer v. Jackson,* 96 Ohio App. 3d 313, 644 N.E.2d 1122 (2nd Dist.1994)

> 2) The common pleas court had no jurisdiction over Demetrios and Natalie's intentional interference with expectancy (Firestone) claims;

3)  The Estate's claim for declaratory relief against Demetrios, i.e. (the mechanic's liens) was not ripe for adjudication because Appellants were record owners;

4)  The common pleas court lacked jurisdiction to entertain the Firestone damage claims of Demetrios and Natalie; and,

5)  Florida, not Ohio, had jurisdiction over the Estate's tort claims, resulting in violation of Appellants' rights to due process.

**{¶37}** We disagree with Appellants' arguments.

**{¶38}** "The power to define the jurisdiction of the courts of common pleas rests in the General Assembly and * * *such courts may exercise only such jurisdiction as is expressly granted to them by the legislature." *Dumas,* quoting *Seventh Urban Inc. v. Univ. Circle Property Dev., Inc.,* 67 Ohio St. 2d 19, 22, 423 N.E.2d 1070, 1073 (1981). "The court of common pleas is a court of general jurisdiction.  It embraces all matters at law and in equity that are not denied to it.* * *The probate court is a court of limited jurisdiction; it can exercise just such powers as are conferred on it by statute and the constitution of the state." *Dumas v. Estate of Dumas,* 68 Ohio St. 3d 405, 1994-Ohio-312,627 N.E.2d 978, citing *Saxton v. Seiberling,* 48 Ohio St. 554, 558-559, 29 N.E.179, 180 (1891).

**{¶39}** In *Dumas v. Estate of Dumas*, *supra,* a widow filed a complaint alleging two causes of action, for fraudulent conveyance of assets and for

fraud.  She did not contest the validity of her husband's will or challenge the estate inventory, but alleged he fraudulently transferred assets to an inter vivos trust with the intent to deprive her of her rights under Ohio law.  The Supreme Court of Ohio considered whether the general division of the Court of Common Pleas rather than the probate division had jurisdiction over the action, and held that the general division did have jurisdiction. In doing so, the *Dumas* court observed that Dumas' complaint alleged two causes of action, one for fraudulent conveyance of assets and one for fraud. The court noted although the outcome of its decision might affect the administration of the Dumas' probate estate, the primary aim of the complaint was the recovery of monetary damages for alleged fraud. The court therefore held that the issues raised in the complaint were solely within the jurisdiction of the general division of the court of common pleas.

{¶40} The *Dumas* court followed the reasoning set forth in *Schucker v. Metcalf,* 22 Ohio St.3d 33, 35, 488 N.E.2d 210, 213 (1986) and which held pursuant to R.C. 2101.24, "the probate division has no jurisdiction over claims for money damages arising from allegations of fraud."[13]  Despite

---

[13] Since *Schucker,* the Supreme Court of Ohio has embraced a broader view of the probate court's jurisdiction.  In *State ex rel. Lewis v. Moser,* 72 Ohio St. 3d 25, 28-29, 647 N.E.2d 155 (1995), the Court adopted the view that: (1) claims for breach of fiduciary duty, which inexorably implicate control over the conduct of fiduciaries, are within the jurisdiction of the probate court by virtue of R.D. 2101.24(A)(1)(c) and (e); and (2) the probate court's plenary jurisdiction at law and in equity under R.C. 2101.24(C) authorizes any relief required to fully adjudicate the subject matter within the probate court's exclusive jurisdiction."  *Keith v. Bringardner,* 10th Dist. Franklin No. 07AP-666, 2008-Ohio-950, ¶ 10.  In *Keith*, the

*Schucker's* narrower view, in the case at bar, we find the common pleas court, general division, appropriately exercised subject matter jurisdiction over the claims tried herein.

{¶41} As a preliminary consideration, we point out, pursuant to R.C. 2311.21, Laisa's death did not result in an abatement of her pending claims. R.C. 2311.21 provides that "…[N]o action or proceeding pending in any court shall abate by the death of either or both of the parties thereto, except actions for libel, slander, malicious prosecution, for a nuisance, or against a judge of a county court for misconduct in office, which shall abate by the death of either party." Laisa's Estate continued the lawsuits in the proper forum in which they had been filed.

{¶42} We also note the cases were initiated by Laisa Prokos and were pending at the time of her death. A mechanic's lien had been filed against her Ohio properties and was recorded in the Athens County Recorder's Office. She filed the cases in the Athens common pleas court because the real estate, subject of the suits, was located in Athens County, Ohio. Laisa disputed Demetrios' claims as a creditor by initiating the lawsuits. Also at

---

appellate court noted all appellant's claims revolved around appellee's conduct as guardians during his guardianship. *Id.* at 13. As such, appellant's claims "[touched] the guardianship" and were within the exclusive jurisdiction of the probate court. *Id.* The appellate court affirmed the trial court's judgment that the probate court had exclusive jurisdiction, notwithstanding appellant's claim for money damages. *Id.*

the time of her death, Laisa owned $49,000.00 in funds held in her Ohio

attorney's client trust account.

A.  Did the probate court have exclusive jurisdiction?

{¶43} Appellants' first argument that the probate court had exclusive

jurisdiction of the claims is simply not persuasive.  The exclusive

jurisdiction of the probate division is set forth in R.C. 2101.24 as follows:

> "(A)(1)(a)  To take the proof of will and to admit to
> record authenticated copies of wills executed, proved,
> and allowed in the courts of any other state, territory, or
> country...;
>
> (b)  To grant and revoke letters testamentary and of
> administration;
>
> (c)  To direct and control the conduct and settle the
> accounts of executors and administrators and order the
> distribution of estates;
>
> (d)  To appoint the attorney general to serve as the
> administrator of an estate…;
>
> (e)  To appoint and remove guardians, conservators, and
> testamentary trustees, direct and control their conduct,
> and settle their accounts;
>
> (f)  To grant marriage licenses;
>
> (g)  To make inquests respecting persons mentally
> impaired…;
>
> (h)  To qualify assignees, appoint and qualify trustees
> and commissioners of insolvents, control their conduct,
> and settle their accounts;

(i)  To authorize the sale of lands, equitable estates, or interests in lands or equitable estates…;

(j)  To authorize the completion of real property contracts on petition of executors and administrators;

(k)  To construe wills;

(l)  To render declaratory judgments, including but not limited to, those rendered pursuant to section 2107.084 of the Revised Code;

(m)  To direct and control the conduct of fiduciaries and settle their accounts.

(n)  To authorize the sale or lease of any estate created by will if the estate is held in trust, on petition by the trustee;

(o)  To terminate a testamentary trust in any case in which a court of equity may do so;

(p)  To hear and determine actions to contest the validity of wills;

(q)  To make a determination of the presumption of death of missing persons…;

(r) To hear and determine an action commenced pursuant to section 3107.41 of the Revised Code…;

(s)  To act for and issue orders regarding wards…;

(t)  To hear and determine actions against sureties on bonds of sureties appointed by the probate court;

(u)  To hear and determine actions involving informed consent for medication of persons hospitalized pursuant to section 51.22.141 or 5122.15 of the Revised Code;

(v) To hear and determine actions relation to durable power of attorney for health care…;

(w) To hear and determine actions commenced by objecting individuals, in accordance with section 2133.05 of the Revised Code;

(x) To hear and determine complaints that pertain to the use or continuation or the withholding or withdrawal, of life-sustaining treatment…;

(y) To hear and determine applications that pertain to the withholding or withdrawal of nutrition or hydration…;

(z) To hear and determine applications of attending physicians in accordance with division (B) of section i n 2133.15 of the Revised Code;

(aa) To hear and determine actions relative to the use or continuation of comfort care in connection with certain principals under durable powers of attorney for healthcare…;

(bb) To hear and determine applications for an order relieving an estate from administration under section 2113.03 of the Revised Code;

(cc) To hear and determine applications for an order granting a summary release from administration under section 2113.031 of the Revised Code;

(dd) To hear and determine actions relating to the exercise of the right of disposition, in accordance with section 2108.90 of the Revised Code;

(ee) To hear and determine actions relating to the disinterment and re-interment of human remains…;

(ff)  To hear and determine petitions for an order for treatment of a person suffering from alcohol and other drug abuse…;

{¶44} Appellants cite *Grimes, supra*; *Johnson v. Johnson,* 4th Dist. Vinton No. 98CA519, 1999 WL 527753; and *Spitzer v. Jackson* in support of their position.  However, *Dumas* and *Schucker* are still good law.  And the cases cited by Appellants are easily distinguished from the underlying facts herein.

{¶45} In *Grimes v. Grimes, supra,* the case concerned three declaratory judgment actions, not tort actions, and did not contain a prayer for monetary relief. The claims were brought by an executor of an estate against the decedent's son.  The claims were first filed in the general division of the common pleas court, but later voluntarily dismissed and re-filed in the probate division.  The executor sought a declaration from the court that the subject properties were being held by the son in a constructive trust for the estate. On appeal, we held the executor's declaratory judgment claims were related to the administration of the decedent's estate and therefore, the probate court had exclusive jurisdiction. In the case at bar, the fact that the case against Appellants concerned tort claims and asked for monetary relief distinguishes it from *Grimes,* a declaratory judgment action relating to the administration of an estate.

{¶46} *Johnson v. Johnson,* 1999 WL 527753, is also not persuasive. In *Johnson,* appellant asserted the probate court did not have jurisdiction to recover assets wrongfully withheld from an estate even if withheld on the basis of fraud. We commented: "that claim confuses the distinction between the tort of fraud and other claims based on fraudulent conduct." We noted the claim was not for monetary damages but rather for the return of substantial assets to the estate. *Johnson* cited *Dumas,* above, reiterating that the probate court would have no jurisdiction to hear a tort fraud claim. Because *Johnson* focused on recovery of estate assets and did not involve a claim for monetary damages, we find it distinguishable from the case at bar.

{¶47} In our consideration of *Johnson,* we cited *Spitzer v. Jackson,* 96 Ohio App. 3d 31, 644 N.E.2d 1122, (2nd Dist.1994), a case directly on point with *Johnson.* The *Spitzer* court also cited the law in *Dumas*, ultimately holding a cause of action for damages from fraud is not within the jurisdiction of a probate court. *Spitzer* is distinguishable from the facts herein because it was a case of return of wrongfully withheld assets, not a "damages for fraud" case.

{¶48} Appellants also direct us to *Tewksbury v. Tewksbury,* 4th Dist. Pike No. 07CA771, 2008-Ohio-4600, which is also not persuasive. There, an estate administrator filed a complaint in the probate division of the common

pleas court against a decedent's son alleging concealment or embezzlement of estate assets. The relevant statute which the administrator brought suit under was R.C. 2109.50. We cited *Wozniak v. Wozniak,* 90 Ohio App.3d 400, 407, 629 N.E.2d 500 (1993), which noted R.C. 2109.50 focuses on the ownership of an asset and whether possession of the asset is being impermissibly concealed or withheld from the estate, as well as *Rudloff v. Efstathiadis*, 11th Dist.Trumbull No. 2002-T-119, 2003-Ohio-6686, which also concluded a probate court had jurisdiction over an action brought pursuant to R.C. 2109.50. In *Tewksbury,* we concluded the probate court possessed jurisdiction to resolve title issues and determine whether assets belonged to the estate. Notably, *Tewksbury* contained no fraud claim or prayer for damages.

{¶49} Appellants' reliance on the above-cited cases is misplaced. And, a review of R.C. 2101.24(A) lists all matters within the exclusive jurisdiction of the probate court. Appellants have cited nothing to convince us that Appellees' fraud claims in tort, requesting compensatory and punitive damages, along with rescission of the deeds to the fraudulently conveyed properties were somehow within the exclusive jurisdiction of the probate court and not properly within the subject matter jurisdiction of the Athens

County Common Pleas Court, General Division. We find no merit to Appellants' argument herein.

B. Did the probate court have jurisdiction over the intentional interference with expectancy claims?

{¶50} Appellants further argue the common pleas court, general division, had no jurisdiction over Demetrios' and Natalie's intentional interference with expectancy claims. However, we would note the jury did not find for Demetrios on these claims, but found in favor of the Kucik Defendants, as reflected by the court's May 27, 2010 judgment entry. Furthermore, the jury instructions which were given on Day 29 of trial do not indicate Natalie's claim for intentional interference with expectancy was submitted to the jury. These arguments are moot and this court need not consider them.

C. Was the Estate's claim for declaratory relief ripe for adjudication?

{¶51} Appellants also argued the Estate's claim for relief against Demetrios for the mechanic's lien, was not ripe for adjudication because Appellants were the record owners of the real estate. However, the first trial determined the Estate was the rightful owner of the property at issue. Once the properties were returned to the rightful ownership of the Estate, Demetrios and the Estate settled the claims regarding the mechanic's lien. The settlement was necessarily approved by the Probate Court and the

common pleas court.  At the time of the settlement, the claims regarding the mechanic's lien were ripe and could be settled because the Estate had been adjudicated owner of the properties.

D.  Did the probate court have jurisdiction over the *Firestone* damage claims?

{¶52} Appellants also argued the general division of the common pleas court lacked jurisdiction to hear the *Firestone* damage claims of Demetrios and Natalie. The Ohio Supreme Court has held "[o]ne who by fraud, duress, or other tortious means, intentionally prevents another from inheriting from a third person an inheritance or gift that he would have otherwise received is subject to liability to the other for the loss of the inheritance or gift."  *Firestone v. Galbreath*, 67 Ohio St. 3d 87, 88, 616 N.E. 2d 202 (1993), citing Restatement of the 2d Law, Torts (1993)58, Section 774B; see, also *Hammond v. Perry,* 4th Dist. Hocking No. 12CA27, 2013-Ohio-3683, ¶ 29.  As previously noted in Section B above, Natalie did not go forward with her claims.  The jury did not find in favor of Demetrios. This argument is also moot.[14]

E.  Did Florida, not Ohio, have jurisdiction over the Estate's tort claims?

---

[14] Appellees' brief pointed out repeatedly that it appeared Appellants "lazily cut and paste[d]" arguments from prior filings in lieu of making arguments. We regret to comment but it does appear that is the case.

{¶53} Appellants' final argument is that the Estate should have been filed in Florida instead of Ohio, and that the tort claims should have been filed in Florida instead of Ohio. As a result, they claim due process violations. However, R.C. 2107.11, provides:

"(A) A will shall be admitted to probate:

(1) In the county in this state in which the testator was domiciled at the time of the testator's death;

(2) In any county of this state where any real property or personal property of the testator is located if, at the time of the testator's death, the testator was not domiciled in this state, and provided that the will has not previously been admitted to probate in this state or in the state of the testator's domicile;

(3) In the county of the state in which a probate court renders a judgment declaring that the will was valid and in which the will was filed with the probate court.

(B) For the purposes of division (A)(2) of this section, intangible personal property is located in the place where the instrument evidencing a debt, obligation, stock, or chose in action is located or if there is no instrument of that nature, where the debtor resides."

{¶54} Appellants' contention has no merit. At the time of Laisa's death in June 2005, she was the record owner of rental properties located in Athens County, Ohio, had a chose in action located in Ohio, and had filed lawsuits in Ohio. Her Estate continued her original claims. She was also the

owner of $49,000 being held in her Ohio attorney's trust account.  For these

reasons, it was proper to open her estate in Athens County.[15]

{¶55} As discussed above, the general division of the common pleas

court in Athens County had jurisdiction over the matter.  The Estate sought a

monetary judgment on its tort claims.  Appellants argue somehow their due

process rights were violated but fail to "connect the dots."  We find no such

violation.  For the above reasons, we find the Athens County Court of

Common Pleas, General Division, had subject matter jurisdiction over the

claims of Demetrios and the Estate.  Appellant's first assignment of error is

overruled.

II.  Combined Assignments of Error Two, Eleven, Twelve, Thirteen,
Sixteen, Seventeen, and Eighteen.

LEGAL ANALYSIS

{¶56} App.R. 16(A)(7) requires an appellant's brief to contain an

argument with citations to authorities.  *McDonald v. McDonald,* 4th Dist.

Highland No. 12CA1, 2013-Ohio-470, ¶ 20.  As this court recently

emphasized in *State v. Pippen*, 4th Dist. Scioto No. 11CA3412, 2012-Ohio-

4692, ¶ 65:

> " 'If an argument exists that can support [an] assignment of
> error, it is not this court's duty to root it out.'" *Thomas v.*

---

[15] Appellees also point out the additional causes of action asserted by the Estate against the Kucik
Defendants were compulsory claims necessarily asserted for complete adjudication of the original action
pursuant to Civ. R. 19(A).

*Harmon,* 4th Dist. No. 08CA17, 2009-Ohio-3299, at ¶14, quoting *State v. Carman,* 8th Dist. No. 90512, 2008-Ohio-4368, at ¶ 31. "It is not the function of this court to construct a foundation for [an appellant's] claims; failure to comply with the rules governing practice in the appellate courts is a tactic which is ordinarily fatal." *Cantanzarite v. Boswell,* 9th Dist. No. 24184, 2009-Ohio-1211, at ¶ 16, quoting *Kremer v. Cox,* 114 Ohio App. 3d 41, 60, 682 N.E.2d 1006 (1996). Therefore, "[w]e may disregard any assignment of error that fails to present any citations to case law or statutes in support of its assertions." *Fry v. Holzer Clinic, Inc.,* 4th Dist. Gallia No. 07CA4, 2008-Ohio-2194, at ¶ 12. See, also, App.R. 12(A)(2); *Albright v. Albright,* 4th Dist. Lawrence No. 06CA35, 2007-Ohio-3709, ¶ 16.

**{¶57}** Under this combined consideration of assigned errors two, eleven, twelve, thirteen, sixteen, seventeen, and eighteen we have mostly paraphrased the errors set forth by Appellants in their brief. In *McDonald, supra,* we found no need to consider deficient assignments of error in the interests of justice. Regarding assigned errors two, eleven, twelve, thirteen, sixteen, seventeen, and eighteen in the case at bar, we are of the same opinion.[16]

A. Assignment of Error Two- The trial court erred in granting Demetrios Prokos' Motion for Summary Judgment.

**{¶58}** Appellees point out Appellants have failed to identify the referenced motion for summary judgment and explain how the trial court

---

[16] We would note Appellants' brief appears to argue only assigned errors one (subject matter jurisdiction); three (validity of Demetrios' claim); four (evidentiary rulings); five (trifurcation); and seven and eight (election of remedies). The brief ends after Appellants argue errors seven and eight. Appellants' reply brief also indicates a reliance on their prior filings in the trial court proceedings since they are "part of the record on appeal," instead of actually setting forth their arguments directly to this court.

erred in granting the motion.[17]  In other words, Appellants have failed to separately argue this assigned error in their brief. We agree that Appellants have waived assignment of error two and accordingly, overrule it.

B. Assignment of Error Eleven-The jury failed to give proper weight to the properly translated video of the decedent Laisa Prokos.

{¶59} Again, we note Appellants fail to argue in their brief this assigned error.  Appellants do not identify where the error occurred, explain why they believe proper weight was not given to the video, nor otherwise explain how this affected the outcome of the trial. Appellants do not cite to the record regarding their arguments under this assigned error. As such, we find Appellants have waived their arguments herein and accordingly, we overrule assignment of error eleven.

C. Assignment of Error Twelve-The jury failed to give proper weight to the overwhelming evidence of the uninfluenced wishes of the decedent Laisa Prokos, thereby giving the false impression to the jury that the decedent was subject to the undue influence of the Kucik Defendants and defendant Nickos Prokos.

{¶60} Again, Appellants have not followed App.R. 16(A)(7) by failing to argue this assigned error separately in their brief. Therefore, it is waived and assignment of error twelve is hereby overruled.

---

[17] Demetrios and Pam filed a motion for summary judgment against Nickos on February 7, 2006. Demetrios, Pam and Natalie filed a motion for partial summary judgment against the Kucik Defendants on June 9, 2006. Demetrios filed a renewed motion for summary judgment on the claims of Nickos on August 22, 2008. Demetrios filed a motion for summary judgment against the Estate and counterclaims for foreclosure of the mechanic's lien on September 10, 2008.  Demetrios filed a renewed motion for partial summary judgment on November 6, 2008.

D. Assignment of Error Thirteen-The trial court erred in granting an award of attorney fees to Demetrios Prokos against Kucik defendants because he did not receive an award of punitive damages against them.

{¶61} Again, Appellants' brief fails to makes any argument under this assigned error.  Appellants do not cite to the record, nor do they provide any case law or statutory authority.  Appellants have waived their argument and assignment of error thirteen is also overruled.

E. Assignment of Error Sixteen.

{¶62} We again find Appellants have waived their arguments under this assignment of error.  To demonstrate how Appellants seem to expect this court to understand and interpret their arguments, despite Appellants' failure to cite to the record and explain their arguments, we set forth fully the assigned error as presented by Appellants:

**THE TRIAL COURT IN JUDGMENT ENTRY FILED NOVEMBER 22, 2010, ERRED IN FAILING TO GRANT KUCIK DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND A NEW TRIAL AND REMITTER FOR THE REASONS STATED IN THEIR MOTION THEREFOR, WHICH PRIMARILY ARE AS FOLLOWS:**

**A.  THE JURY INSTRUCTIONS AND THE EVIDENCE DO NOT SUPPORT THE COMPENSATORY DAMAGES AWARDED TO THE ESTATE($49,000) AND DEMETRIOS PROKOS ($5,000);**

**B.  ASSUMING THE COMPENSATORY DAMAGE AWARDS ARE VACATED, THEN BY STATUTE AND RELEVANT**

**CASE LAW, THE PUNITIVE DAMAGE AWARD MUST BE VACATED;**

**C.  THE JURY INSTRUCTIONS WERE SUCH THAT THE TRIAL JUDGE FAILED TO COMPLY WITH APPLICABLE STATUTES IN ITS INSTRUCTIONS;**

**D.  ALL OF THE GROUNDS ASSERTED IN THE MOTIONS FOR DIRECTED VERDICT MADE AT TRIAL; AND,**

**E.  OTHER GROUNDS AS SET FORTH IN CIVIL RULES 50 AND 59 OR APPLICABLE STATUTES.**

{¶63} Appellants have combined multiple and potentially complex arguments under a single assignment of error.  In *Grimes, supra*, at ¶ 15, fn.4, this court noted "[t]hough appellate courts have the option to address two or more assignments of error at once, the parties do not.  See, also, *Powell v. Vanlandingham,* 4th Dist. Washington No. 10CA24, 2011-Ohio-3208, ¶ 24; *Keffer v. Cent. Mut. Ins. Co.,* 4th Dist. Vinton No. 06CA652, 2007-Ohio-3984, ¶ 8, fn.2.  Parties must comply with the Ohio Rules of Appellate Procedure.  *Grimes,* at ¶ 15, fn.4.  If not, App.R. 12(A)(2) permits us to disregard those assignments of error that are not separately argued.  *Id.* Appellants' extremely vague references to "all of the grounds asserted in the motions for directed verdict made at trial" and "other grounds as set forth in Civil Rules 50 and 59 or applicable statues" are clearly not compliant under App.R. 16(A)(7).

{¶64} Within this assignment of error, Appellants' brief argument about the propriety of the jury instructions is also vague. As we discuss below in Section III, Appellants assert the argument in assignment of error three that it was error to submit Demetrios' claim for fraudulent transfer to the jury because Demetrios did not meet the burden of proof that he was a "creditor" within the meaning of R.C. 1336.01. However, Appellants did not make any arguments about the jury instructions under assigned error three. Within this assignment of error, Appellants again do not make specific arguments or direct us to the transcript. We decline to address Appellants' assertion that the jury instructions did not comply with applicable law.

F. Assignment of Error Seventeen-The trial court erred in ruling that the Kucik Defendants could not adduce evidence of the financial transactions between Vasilios Prokos, regarding the lack of evidence supporting Demetrios Prokos' basis for the mechanic's liens.

{¶65} Appellants have again failed to separately argue this assignment of error in their brief. Appellants fail to identify in the record where this alleged error occurred and fail to identify in setting forth the assignment of error which exhibit was proffered. See Appellants' assignment of error

seventeen, set forth fully on page 20 above.  Pursuant to App. R. 16(A)(7), we may disregard this assignment of error.[18]

{¶66} Accordingly, Appellants have waived argument under assignment of error seventeen, and it is hereby overruled.

G. Assignment of Error Eighteen-The trial court erred in its journal entry on proposed settlement, filed September 23, 2010, in finding or assuming the validity of the mechanic's liens.

{¶67} Similar to our view set forth under assignment of error seventeen, Appellants failed to separately argue this assignment of error. They cite no case law or statutory authority relating to this assignment of error.  And, the assignment of error relates to the validity of the mechanic's liens. [19] Appellants failed to abide by the applicable appellate rule and agreed to trifurcation of the mechanic's liens issues.  Appellants have waived their right to argue the issue raised under this assignment of error and accordingly, error eighteen is also overruled.

III. Assignment of Error Three - Was Demetrios a "creditor" within the meaning of the fraudulent conveyance statute?

LEGAL ANALYSIS

---

[18] Furthermore, we find Appellants waived this argument by agreeing to the trifurcation and postponing the issue of mechanics liens to the second phase of trial.  Ostensibly, evidence of financial transactions between father and son would be evidence going to the issue of the validity of the mechanics liens. We discuss the trifurcation issue fully in Section 4 below.

[19] We reiterate, Appellants agreed to trifurcation of the mechanic's liens' issue.

{¶68} Appellant argues the trial court erred in submitting the claim of fraudulent conveyance to the jury without proof of the validity of the claimant's claim, and in instructing the jury to consider the claim. Appellee has responded that Demetrios met his burden of proof in establishing that he was a creditor for purposes of the fraudulent conveyance statute. We agree with Appellee.[20]

{¶69} R.C. 1336.04, Transfer made or obligation incurred as fraudulent to a creditor, defines a fraudulent conveyance as follows:

> "(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or within a reasonable time, not to exceed four years after, the transfer was made, or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
>
> (1) With actual intent to hinder, delay or defraud any creditor of the debtor;
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:
>
> (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

---

[20]Additionally, we note although Appellants state within this assignment of error (as well as in assignments of error 6 and 16), that the trial court erred in instructing the jury to consider Demetrios' claim, Appellants do not make this argument, but for a vague statements on pages 76 and 78 of their brief, respectively: "Defendant Demetrios Prokos cannot state a claim for fraudulent conveyance under the UFTA, and no jury instruction should be given based on that act" and "[t]he jury instructions should have been modified in conformity with the foregoing argument." We will address Appellants' vague contentions about the jury instructions in our discussion of assignment of error 16 below.

(b)  The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(B)  In determining the actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:

(1)  Whether the transfer or obligation was to an insider;

(2)  Whether the debtor retained possession or control of the property transferred after the transfer;

(3)  Whether the transfer or obligation was disclosed or concealed;

(4)  Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(5)  Whether the transfer was of substantially all of the assets of the debtor;

(6)  Whether the debtor absconded;

(7)  Whether the debtor removed or concealed assets;

(8)  Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)  Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)  Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the
business to a lienholder who transferred the assets to an insider
of the debtor."

{¶70} R.C. 1336.01 sets forth the Ohio Uniform Fraudulent Transfer

Act definitions.  "Claim" is defined as "a right to payment, whether or not

the right is reduced to a judgment, liquidated or unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable,

secured, or unsecured." R.C. 1336.01(C).  "Creditor" is defined as "a person

who has a claim."  R.C. 1336.01(D).

{¶71} The issue of whether or not an individual possessing a cause of

action in tort was a "creditor" within the meaning of R.C. 1336.01, with the

right to question an alleged fraudulent conveyance was addressed in *Stein v.

Brown,* 18 Ohio St. 3d 305, 480 N.E.2d 1121 (1985).[21]  The *Stein* court

answered the question affirmatively, noting that its conclusion was "clearly

warranted by the language of the statute which includes unmature,

unliquidated, or contingent claims."  See, also, 37 American Jurisprudence

2d (1968) 818-819, Fraudulent Conveyances, Section 145; Annotation 73

A.L.R.2d 749.Cf. (1968). *Pennell v. Walker*, 68 Ohio App. 533, 36 N.E.2d

150 (1941).  Black's Law Dictionary provides similar definitions for the

terms "creditor" and "claim." (7th Ed.Rev. 1999), 240, 4375;  *Sowers v.*

---

[21] When *Stein* was decided, the definitions contained in R.C. 1336.01 listed "Creditor" at 1336.01(C). "Creditor" is now defined and listed at R.C. 1336.01(D). The content of the definition of creditor did not change.

*Luginbill*, 175 Ohio App.3d 745, 2008-Ohio-1486, 889 N.E.2d 172. Also,

see generally, *Phillips v. Phillips,* 4th Dist. Vinton No. 96CA503, 1997 WL

188780 (Apr.15, 1997).   As we begin our analysis, we are mindful of the

standard of review, previously set forth regarding the weight of the evidence.

{¶72} Appellants argue Demetrios failed to establish that he was a

"creditor" as defined under the fraudulent transfer act.  Clearly, Appellants

ignore the fact that one possessing a "cause of action" in tort is a "creditor"

within the meaning of the fraudulent conveyance statute and pursuant to the

law set forth in *Stein.*  Under the definitions set forth above, Demetrios was

a "creditor," a person with a claim.  R.C. 1336.01(D).  "Claim" is defined as

a "right to payment," whether or not it is "reduced to judgment" or

"disputed," which is particularly relevant under these facts.[22]  Demetrios

testified as to his claim and the basis for it during trial.

{¶73} The trial transcript reflects Demetrios' testimony that he began

managing the rentals full-time in 1995 or 1996 until December 2003. On

cross-examination, Demetrios testified he had an agreement with his father

regarding his management of the properties, and his investment in them.  He

also testified his mother was aware of the agreement. Demetrios was forced

to admit she had denied the existence of any agreement prior to her death.

---

[22] R.C. 1336.01(C).

{¶74} The jury heard the following testimony on direct examination

of Demetrios, regarding the mechanic's lien and affidavit of title:

"Q:    * * * In January you filed a mechanic's lien, is that
correct?

A:    Yes.

Q:    And you also filed an affidavit of facts related to realty,
correct?

A:    Yes.

Q:    Now why did you file this mechanic's lien.

A:    Um, we heard through the grapevine, let's say, that um,
the properties were ready to be sold, um uh to Mr. Larry
Conrath.  Um, and uh at an extreme low price.  Uh over
the years that I was managing the properties, I have put a
lot of money in them.  Um, and uh, uh and I was
expecting that I would get this money back. Um, also had
uh, uh, I was expecting that my parents had the kids, I
would get my part. Um and uh I did have to protect my
investment uh and to protect my mom from losing her
um, equity on the properties that they were, had worked
so hard over their lives to accumulate."

{¶75} On cross-examination, Demetrios also testified as follows how

he had "calculated" or arrived at the number amount of the mechanic's liens:

"Q.    Now you've talked about an agreement with your father I
believe to manage his properties.  And back in my office,
which is really R.J. Shostak's office.  He's got tuns(sic)
of paper associated with expenses that you, you know,
documents you produced. Um, in reading your
depositions my understanding was those documents
relate not only to the properties at issue in this case, but
also all your properties, don't they?

A:     Yes.

Q.     Okay, it's hard to distinguish between the two?

A:     Yes.

Q:     And in the end, you said, and I think Mr. Finley was the one who asked you this in, in a deposition, you said, I'm not relying on those documents.

A:     I don't know if I said that.

Q:     I, I can find it, but uh, in any event the, but, really you are relying on an agreement for two maintenance men full time over a period of time, aren't you?

A:     Correct.

Q:     And, and uh, but you don't have a written agreement to that effect?

A:     No.

Q:     And at least you haven't been able to find one, and its' been five years?

A:     Correct

Q:     Okay, I'm sorry. Um so what was the rate you used to determine the amount of the mechanic's lien?

A:     The, well we used to people, two maintenance men, and um and uh with the overhead, we had figured it out that it would be at the cost of ten dollars and seventy cents an hour.  That is with their, with overhead.

Q:     Forty hours a week?

A:     Forty hours a week.

Q:      Fifty-two weeks a year?

A:      Yes.

Q:      For it think it comes out to seven or eight years?

A:      Seven and a half years if I remember right.

Q:      And what's the basis for the agreement?

A:      That's how we agreed on it.

Q:      And you made that agreement with your father you said?

A:      Yes."

{¶76} A jury sitting as the trier of fact is free to believe all, part or none of the testimony of any witness who appears before it. *State v. Grube*, 987 N.E.2d 287, 2013-Ohio-692, ¶ 31; *see State v. Long,* 127 Ohio App.3d 328, 335, 713 N.E.2d 1 (4th Dist. 1998); *State v. Nichols*, 85 Ohio App.3d 65, 76, 619 N.E.2d 80 (4th Dist. 1993). A jury is in the best position to view the witnesses and to observe witness demeanor, gestures and voice inflections, and to use those observations to weigh credibility. *Grube* at 31; *see also Myers v. Garson,* 66 Ohio St.3d 610, 615, 614 N.E.2d 742 (1993); *Seasons Coal Co.v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273(1984). Appellate courts should not generally second-guess juries on matters of weight and credibility. *Grube* at ¶ 31; see also *State v. Vance,* 4th Dist No. 03CA27, 2004-Ohio-5370, ¶10.

{¶77} The trial judge and the jury heard the testimony of various witnesses over the course of the 31-day trial. The jury heard and observed Demetrios as he testified about his business relationship with his father, his management of his parents' rental properties, and his claim for reimbursement for time spent and money invested in his parents' properties.

{¶78} The jury also heard much testimony which characterized Demetrios as a mean and greedy character. Nickos testified that tension with Demetrios dated back to their childhoods. He also testified that Demetrios "ripped him off" on a business venture. He testified Demetrios owed him $200,000.00. He testified their parents had revoked Demetrios' power of attorney in 2001 because Demetrios had too much control over the properties and was commingling the rents with his own accounts.

{¶79} Pam's testimony also painted an unflattering portrayal of Demetrios. Pam testified Demetrios' relationship with their mother was not good. Pam testified her mother did not trust Demetrios. Pam testified that Demetrios yelled at their parents, demanding that they sign the rental properties over to him. Importantly, Pam testified there was no financial arrangement which she was aware of, that Demetrios would be reimbursed for caring for the properties. Yet during re-cross examination, Pam acknowledged previously testifying in a June 2007 deposition that

Demetrios had a claim for money owed him, due to taking care of their father's properties.

{¶80} The jury not only heard Barry Kucik, Pam, Natalie, and Nickos testify, but also observed their demeanor and assessed their credibility. After hearing all this testimony, the trial court evaluated the witnesses' testimony and decided the creditor issue was a question of fact for the jury. Similarly, the jury determined the credibility of the witnesses and returned a verdict in favor of Demetrios on his claims of fraud and fraudulent transfer. Both the trial judge and the jury were in the better position to view the witnesses and assess their credibility. We will refrain from second-guessing their judgment as to Demetrios' truthfulness as he testified about his agreement with his father and the basis for his claim. We agree with Appellee, Demetrios, that he met his required burden of proof in establishing he was a creditor for purposes of the fraudulent conveyance statute. Accordingly, we overrule assignment of error three.

IV.  Combined Assignments of Error Four, Five, and Nine - Have Appellants waived their arguments hereunder by agreeing to trifurcate the issues presented at trial?

LEGAL ANALYSIS

{¶81} An appellate court reviews a trial court's decision on bifurcation issues under the abuse of discretion standard of review. *Harris*

*v. Huff,* 11th Dist. Trumbull No. 2008-T-0090, 2010-Ohio-3678, ¶ 36, citing

*Spencer v. Lakeview School Dist.,* 11th Dist. Trumbull No. 2005-T0083,

2006-Ohio-3429, ¶ 17 (Citation omitted.).  This is because the trial court is

in the best position to decide whether bifurcating issues is appropriate.  *Id.*

An abuse of discretion is the trial court's "' failure to exercise sound,

reasonable, and legal decision-making.'" *Harris, supra,* quoting *State v.*

*Beechler,* 2nd Dist. Clark No. 09CA-54, 2010-Ohio-1900, quoting Black's

Law Dictionary (8 Ed.Rev. 2004) 11.

{¶82} However, in *Gall v. Gall*, 8th Dist. Cuyahoga No. 47889, 1984

WL 3564, the appellate court considered appellant's assignment of error

complaining that the referee erred in bifurcating issues for trial without the

parties' consent.  The appellate court, however, noted that both parties had

consented to a bifurcated hearing. Having done so, the court concluded,

appellant could not raise on appeal errors which were waived at trial. See,

e.g., *Blausey v. Stein,* 61 Ohio St. 2d 264, 400 N.E.2d 408 (1980).

Furthermore, "[t]he doctrine of invited error estops an appellant, in either a

civil or criminal case, from attacking a judgment for errors the appellant

induced the court to commit.  Under that principle, a party cannot complain

of any action taken or ruling made by the court in accordance with the

party's own suggestion or request."  *State v. Kennedy,* 2nd Dist. Champaign

No. 2011-CA-3, 2011-Ohio-4291, ¶ 37, quoting *Royse v. Dayton,* 195 Ohio

App.3d 81, 2011-Ohio-3509, 958 N.E.2d 994, ¶ 11, citing *State v. Woodruff,*

10 Ohio App. 3d 326, 462 N.E.2d 457 (2nd Dist. 1983). See, also *Davis v.*

*Remy*, 4th Dist. Jackson No. 05CA16, 2006-Ohio-5030. Similarly, we find

Appellants have waived the arguments under these assignments of error by

agreeing to trifurcate the trial. In an effort to make Appellant's assignments

of error more succinct, they have been paraphrased. We will address each

argument only briefly, beginning with assignment of error five for ease of

analysis.

A. Assignment of Error Five - The trial court erred in trifurcating the trial
into three phases: (1) the fraud claims, etc.; (2) the mechanics lien; and (3)
all other "personal claims."

{¶83} The parties' agreement to trifurcate the issues presented for trial

is well-documented in two pertinent court entries. On July 24, 2009, a

Journal Entry memorialized the discussion about trifurcation, noting that the

parties were directed to consider trifurcation and be "prepared to state their

positions with reasoning at the next status conference." On September 21,

2009, the Court issued the following Entry, stating in pertinent part:

> "The parties agreed to trifurcate the trial. The first trial will
> concern the claims surrounding the allegedly fraudulent
> conveyances of the seven real estate parcels from Laisa Prokos
> (and Nickos Prokos as attorney-in-fact) to the Kucik
> Defendants. Additionally, the Firestone allegations and fraud
> allegations of Demetrios Prokos against the Kucik Defendants

and Nickos Prokos will be heard during the trial along with all remaining tort claims that the Estate of Laisa Prokos have against both the Kucik Defendants and Nickos Prokos. All parties would participate in this trial….

The second trial will concern Demetrios Prokos' mechanics lien claim against the owner of the seven real estate parcels as determined in the first trial….

The third trial will concern the remaining tort and contract claims of Demetrios Prokos, Nickos Prokos, and Natalie Bowles…."

{¶84} Finally, the trial transcript references the agreement to trifurcate at Volume 762, page 153. A discussion was held amongst counsel and the court as follows:

"BY THE JUDGE:          * * *In the middle of this thing I got to thinking well we should have had the mechanic's liens as part of this. Nobody wanted it part of it. Nobody said Judge now let's have the mechanic's liens as part of it. Nobody said that. Now I wish I had done that. So I think, go ahead, I'll let you finish.

BY MR. HENNIGER:     Okay. I understand what you're saying. And I think we made an agreement to that. And to a certain extent that binds us."

And at page 156:

"BY THE JUDGE:        The mechanic's liens. Nobody objected. We all agreed that the mechanics liens would be addressed later on. You're not going to get beyond the shield of the mechanics lien. The mechanics lien is what it is. The validity of it is going to be addressed at Prokos two."

And at page 157:

"BY MR. HOLLINGSWORTH:          Okay.  And I realize that I must be bound by my predecessor's, whatever he did. But I did file a motion to have the two trials consolidated for just this reason.  And it apparently was too late."

**{¶85}** The issue of trifurcation was also discussed on day 26 of trial,

as set forth as follows at Volume 776, page 167:

"BY ATTORNEY HENNIGER:        You have to demonstrate the validity of the lien. Since we're in this box, so to speak of having trifurcated the trial and, and evidentiary rulings that the Court made and I'm not quarreling with any of that. I, it's just where we are.  And so, um they agreed to it."

**{¶86}** It is undisputed the parties agreed to a trifurcation.  Appellants

have waived any argument in this regard.  Appellants' assignment of error

five is therefore overruled.

B. Assignment of Error Four - The trial court erred in making its evidentiary rulings that neither party could adduce evidence beyond some minimal amount to prove or disprove the validity of the mechanic's liens.

**{¶87}** With regard to the evidentiary rulings, Appellants have failed to

cite to the record where the rulings were made. Pursuant to App.R. 12(A)(2),

appellate courts may disregard an assignment presented for review if the

party raising it fails to identify in the record the error on which the

assignment of error is based.[23] As indicated above, the trial court referred to

---

[23] Our review of the record indicates a discussion amongst the court, counsel, and parties on Day 12 of trial of a proffer of evidence of expense sheets proffered by Attorney Hollingsworth. The trial court acknowledged Attorney Hollingsworth had become involved in the case somewhat recently while denying the exhibit due to its being "late discovery." There was again a lengthy discussion of "evidentiary rulings" on Day 17  involving mortgage payments and impeachment of Demetrios.  The transcript reflects another sidebar discussion with counsel and proffer of exhibits on behalf of the Kucik Defendants on Day 20 in

the agreement to trifurcate.  Appellants' argument must fail because they

have failed to reference the evidentiary rulings in the record and further,

because they agreed to trifurcation of this issues.  As such, they have waived

any argument as to this error and assignment of error four is also overruled.

C. Assignment of Error Nine - The trial court erred to the substantial
prejudice of Appellants in permitting the estate fiduciary to proceed in trial
without prosecuting the original claims of the decedent against Demetrios,
thereby giving the jury the false impression that the claims of Demetrios
were meritorious.

{¶88} With regard to the trial court's allowing the fiduciary to

proceed in trial without prosecuting the original claims of the decedent

against Demetrios, we note once again, Appellants agreed to trifurcation.

Under the agreement, the validity of the mechanic's liens would be

determined at the second trial.  Laisa had originally contested the

mechanic's liens and the Estate continued her claim.  Demetrios had

counter-claimed for foreclosure of the mechanic's lien. Appellants were

well-aware going into the first trial only the fraud and other claims in tort

---

which the transcript also reflects the exhibits were not allowed as evidence, again due to being "late discovery."   On Day 22 of trial, the record reflects an objection as to Nickos' testimony "summarizing  two years' of banking activity" as hearsay.  The trial court sustained the objection and ordered the testimony stricken from the record.  On Day 23, another objection was made regarding  a line of questioning about health expenses as improper hearsay.  The trial court sustained the objection based upon the fact there had been no discovery of health expenses. Although it was not this court's duty to "root out" these occurrences in the record, the trial transcript reflects these and other instances of "evidentiary rulings" of which Appellants may be complaining. Appellants completely fail to identify or argue the purportedly erroneous evidentiary rulings.

would be at issue.  Again, Appellants have waived this argument and the

ninth assignment of error is also overruled.

V.  Assignment of Error Six – The trial court erred to the prejudice of the
Kucik Defendants, and any jury finding is tainted thereby, in submitting
claims to the jury that included the claim of fraudulent conveyance.

## STANDARD OF REVIEW

{¶89} The giving of jury instructions is within the sound discretion of

the trial court and will not be disturbed upon appeal absent an abuse of

discretion.  *Miller v. Andrews,* 5th Dist. Richland No. 12CA44, 2013-Ohio-

2490, ¶ 26; *State v. Martens,* 90 Ohio App.3d 338, 629 N.E.2d 462 (3rd Dist.

1993).  In order to find an abuse of discretion, we must determine that the

trial court's decision was unreasonable, arbitrary, or unconscionable and not

merely an error of law or judgment.  *Miller, supra,* citing *Blakemore v.*

*Blakemore,* 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). Jury instructions

must be reviewed as a whole.  *Miller, supra*; *State v. Coleman*, 37 Ohio

St.3d 286, 525 N.E.2d 792 (1988).  Whether the jury instructions correctly

state the law is a question of law, which we review de novo.  *Miller, supra*;

*Murphy v. Carollton Mfg. Co.,* 61 Ohio St. 3d 585, 575 N.E.2d 828 (1991).

## LEGAL ANALYSIS

{¶90} The trial court has the duty to instruct the jury on the applicable

law on all issues raised by the pleadings and evidence, and it must give jury

instructions that correctly and completely state the law. *Miller, supra* at ¶ 25; *Pallini v. Dankowski,* 17 Ohio St.2d 51, 53, 245 N.E.2d 353 (1969); *Marshall v. Gibson,* 19 Ohio St.3d 10, 12, 482 N.E.2d 583 (1985); *Murphy v. Carrollton Mfg. Co.,* 61 Ohio St.3d at 591; *Groob v. Keybank,* 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 32. A jury charge should be "a plain, distinct and unambiguous statement of the law as applicable to the case before the jury the proof of fact adduced." *Miller, supra*, quoting *Marshall* at 12, citing *Parmlee v. Adolph,* 28 Ohio St. 10 (1875), paragraph two of the syllabus. Further, "[a] charge ought not only be correct, but it should also be adapted to the case and so explicit as not to be misunderstood or misconstrued by the jury." *Id.,* citing *Aetna Ins. Co. v. Reed,* 33 Ohio St. 283, 295 (1877).

**{¶91}** The trial court gave the following instruction to the jury on Day 29 of trial:

> "Demetrios Prokos alleges that Nickos Prokos and the Kucik Defendants have fraudulently transferred or conveyed Laisa Prokos' assets to Nickos Prokos and the Kucik Defendants in order to put those assets beyond the reach of the claims of Demetrios Prokos. One (I). definition: assets means property of the Debtor but does not include property to the extent that it is encumbered by a valid lien. Debtor means a person who is liable on a claim. Creditor means a person that has a claim. Insider means a relative of the Debtor of a general partner of the Debtor, a partnership in which the Debtor is a general partner, a general partner in a partnership. Claim is a right to payment whether or not the right is reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secure or insecure. Transfer means any direct or indirect absolute or conditional, involuntary or involuntarily method of disposing or parting with an asset or an interest in an asset, and includes payment of money, release, lease, in creation of a lien, or other encumbrance.  Insolvent means that the sum of the debts of the Debtor is greater than all the assets of the Debtor at a fair valuation.  A Debtor is presumed insolvent if the Debtor is not paying debts as they become due."

{¶92} The trial court further instructed:

"Two (II), fraudulent transfer:  there are several tests for finding whether or not a fraudulent transfer to avoid a claim has taken place.  If you find that Nickos Prokos and the Kucik Defendants have violated any of these tests, you must find that Nickos Prokos and the Kucik Defendants have committed a fraudulent transfer to avoid a claim.  Based upon the definitions I have given you, an individual commits a fraudulent transfer as to a claim when: one (1) the individual made a transfer or incurred an obligation. Two (2), the individual did not receive a reasonably equivalent value in exchange for the transfer or obligation.  Three (3), the individual is insolvent at the time or became insolvent as a result of the transfer or obligation and or the claim arose before the transfer was made or the obligation was incurred."

{¶93} The trial court also gave this instruction:

"An individual also commits a fraudulent transfer as to a claim when: one (1), the individual made a transfer or incurred an obligation.  The transfer was made to or the obligation incurred with respect to an Insider or a pre-existing debt. Two (2), the individual was insolvent at the time.  Three (3), the Insider had reasonable cause to believe that the individual was insolvent and the creditors claim arose before the transfer was made or the obligation was incurred.  A Debtor commits a fraudulent transfer when either before or after a creditor's claim arose, the Debtor made a transfer or incurred an obligation in either of the

following ways: one (1), with actual intent to hinder, delay, or to defraud any creditor of the Debtor, or without receiving a reasonably equivalent value in exchange for the transfer or obligation and if either of the following applies: "a" (a), Debtor was engaged in or about to engage in a business or transaction of which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction, or "b" (b), the Debtor intended to incur or believe or reasonably should have believed that he would incur debts beyond his ability to pay as they became due."

{¶94} Appellants again allege that Appellees did not establish that Demetrios was a creditor within the meaning of the fraudulent conveyance statute. Appellants also generally argue that (1) fair consideration was paid by the Kucik Defendants for the Ohio properties; (2) the conveyance did not leave the Estate insolvent; and (3) that the real estate was not as "asset" as defined by the statute. We note at the outset that once again, Appellants fail to cite to specific instances in the record to support their contentions and fail to argue how they were prejudiced by the allegedly erroneous instructions. We also decline to address Appellant's first argument as we have previously disposed of it under assignment of error three, wherein we found Demetrios did meet his burden of proof to establish he was a "creditor," pursuant to case law and the definition contained in R.C. 1336.01. We will address Appellants' remaining arguments under this assignment of error.

A. Was Laisa paid fair consideration for her properties?

{¶95} As to Appellant's second assertion, that fair consideration was paid by the Kucik Defendants for the Ohio properties, they fail to point to any testimony which we could find persuasive. What the testimony does demonstrate is that there were two separate and secret real estate deals between Barry Kucik and Laisa to purchase her rental properties. The properties were heavily mortgaged as the mortgage payments had fallen behind after Vasilios' death in 2003. Demetrios had filed his mechanic's lien in January 2004. William and Michelle Biddlestone both testified that the properties were in deplorable condition when they took over management in March 2004.

{¶96} Barry Kucik testified the purchase price for the whole deal was $575,000.00. Barry Kucik's testimony evidences payment of somewhere between $193,000.00 and $213,000.00 for the first three properties that were the subject of the first real estate deal. The evidence at trial also demonstrated Kucik paid $100,000.00 directly to Nickos after Laisa's death for the remaining 4 properties.[24]

---

[24] Kucik's testimony is confusing and contradictory. At one part of the transcript, he testified $193,000.00 went to Laisa and Nick for the first deal. He later admitted he did not know how much went to them for the second deal. In fact, Kucik admitted the money was paid to different persons and different entities for the purchase of Laisa's property.

{¶97} Kucik also admitted on cross-examination that he provided his money "behind the scenes." He did not really know where the money went that he paid. In trial testimony, Kucik later admitted Nick was getting the money and he [Kucik] was getting the deeds. He gave the checks to Nick because Laisa kept saying "Go through Nick." Kucik opined Laisa got the best value for her properties, given her particular circumstances.

{¶98} Appellants also presented the testimony of two expert witnesses at trial, Sheldon Patrick Estep and William Preston Parker, licensed real estate appraisers. Both gentlemen testified as to the various formulas and approaches to preparing real estate appraisals.

{¶100} Parker testified he appraised Laisa's residential rentals at West Washington Street, Brown Street, Mound Street, and Moore Avenue in 2008. He was asked to do the appraisal by Barry Kucik's prior counsel in these proceedings, R.J. Shostak. All the information Parker received as to the physical condition and the management of the rentals was received from Attorney Shostak and Attorney Biddlestone. He received none of his information from independent sources. Parker testified he never inspected the rentals during the years Demetrios was manager. He testified as to a June 2005 value for the rentals though he was never inside them at the time.

Parker's appraisal as to a total value of $447,000.00 is broken down as

follows:

| | |
|---|---|
| 186 W. Washington Street (April 20, 2005) | $70,000.00 |
| 208 ½ W. Washington Street (April 20, 2005) | $75,000.00 |
| 45 Mound Street (June 2005) | $90,000.00 |
| 48 Moore Street (June 2005) | $95,000.00 |
| 6 Brown Street (June 2005) | $88,000.00 |
| 120 N. Congress Street (June 2005) | $ 95,000.00 |

{¶101} Sheldon Patrick Estep prepared an appraisal for the

commercial rental, Souvlakis,[25] located at 9 W. State Street.  Estep's

appraisal was performed in March 2009.  Using the various appraisal

formulas, Estep appraised the April 2005 value of 9 W. State Street to be

somewhere between $476,000.00 and $569,000.00.  Estep testified, similarly

to Parker's testimony, that he was not advised of the condition of the

property when Demetrios managed it and he was not advised there was a

period of time in March 2004 when no one was managing the property.

Parker had no idea of a 2003 or 2004 value of the property. Parker testified

he had not been inside the property for over 20 years, except for the 2009

appraisal.  He understood he was doing the appraisal for trust accounting

---

[25] The 9 W. State Street property was comprised of Souvlakis, a tanning business, and 4 apartments.

purposes and his only information on the properties was from the people who hired him to appraise.

{¶102} It appears the properties were given 2005 values by appraisers hired on behalf of Appellants in a range of $923,000.00- $1,016.000.00 for all 7 properties. A local realtor, Larry Conrath, testified he had offered to buy the properties at "fire sale prices."  Conrath had offered $750,000.00 and gave his own estimate as to their value at $905,000.00.  Demetrios never obtained a formal appraisal.  He opined the properties were worth $2,000.000.00

{¶103} After Conrath declined, Nickos and Laisa  could not find another  buyer due to Demetrios' filing of the mechanic's liens.[26]  Kucik indicated he was interested.  Kucik offered to give them a loan for equity, subject to the liens, and would give them an opportunity to buy back when they were able to refinance and extinguish the liens.  Throughout the trial, Appellants' characterized the transactions as "a land contract, "creative financing," and "an untraditional way to buy property."

{¶104} Kucik explained the "plusses and minuses" to Laisa.  Nickos testified she was competent and understood.  Nick specifically testified his

---

[26] Demetrios' lien was in the amount of $333,880.00.

mother had no reservations about Kucik. In fact, because he was an attorney, she "trusted him even more."

{¶105} In conclusion, the evidence adduced at trial does little to convince us that fair consideration was paid to Laisa for her 7 rental properties. The true value of the properties was never affirmatively established at trial. They were sold for a total of approximately $313,000.00. The first 3 properties were conveyed during the time when Laisa was isolated from her family, except for Nickos. The remaining 4 properties were conveyed via power of attorney on the day of her death. It is debatable as to how much of the money ever touched Laisa's hands. For the foregoing reasons, we find no merit to Appellant's argument that there was evidence of sufficient consideration paid to Laisa and therefore, the jury instruction on fraudulent transfer/conveyance was erroneous.

B. Was Laisa's Estate left insolvent by the real estate transactions?

{¶106} Next, Appellants assert that the conveyances did not leave Laisa's estate insolvent. Interestingly, the trial transcript was replete with instances where Nickos testified that both parents and especially, Laisa, had financial problems and feared she was about to lose her residential home near the end of her life. The testimony showed that even after Laisa's death, Kucik paid money directly to Nickos, instead of to the Estate. Cash money

Laisa received for the sale of her property in Greece, transported by Alieke from Greece in two payments, was not made part of Laisa's estate assets. Nickos admitted on cross-examination he had never given money to Natalie or the estate. Nickos was questioned about an alleged receipt of a $250,000.00 check for life insurance after Vasilios died. Nickos testified there was no evidence his mother ever received that money. The last rental payment for Souvlakis, $7,100.00, was not made part of Laisa's estate. Jeff Finley, the Estate fiduciary appointed in May 2007, clearly testified that Laisa's estate had no assets in Ohio. Appellants fail to cite exhibits or testimony in the record which would otherwise indicate the estate was solvent. Their argument herein is not persuasive.

C. Were Laisa's properties "assets" within the meaning of the fraudulent conveyance statute?

{¶107} Finally, Appellants argue that the properties conveyed were not "assets" within the meaning of the fraudulent conveyance statute due to Demetrios' recording of the liens. Appellants cite R.C. 1336.01(B) which provides that an "asset" is the property of a debtor, but does not include property "to the extent it is encumbered by a valid lien." R.C. 1336.01(B)(1).

{¶108} This litigation began as a result of the mechanic's lien, which Laisa vehemently disputed. Demetrios recorded the liens in January 2004.

Barry Kucik recorded the deeds in July 2005. The Estate continued to pursue Laisa's claims against Demetrios and the validity of the liens. Nickos, Pam, and Barry Kucik all testified at trial that they did not think that Demetrios' claim and the mechanic's liens had any merit. Indeed, the issue of the mechanic's liens was reserved for the second phase of trifurcation by the agreement of the parties. At the time the deeds were recorded by Barry Kucik, the liens had not been judicially determined to be valid and the properties Kucik claimed to have purchased were still assets of the Estate. Appellants' argument hereunder is also not persuasive.

{¶109} For the above reasons, we find the trial court did not err or abuse its discretion in its submission of the jury instructions on fraudulent transfer/conveyance. Assignment of error six is also overruled.

VI. Combined Assignments of Error Seven, Eight, and Fifteen-Election of Remedies and Equitable Award

A. THE TRIAL COURT ERRED IN RULING AND PERMITTING THE JURY TO CONSIDER INCONSISTENT REMEDIES, IN THAT THE PREVAILING PARTIES SHOULD NOT BE PERMITTED TO GAIN TITLE TO THE SUBJECT REAL PROPERTIES FREE AND CLEAR OF MORTGAGES THAT HAD BEEN PAID BY THE KUCIK DEFENDANTS OR ONE OF THEM.

B. THE TRIAL COURT ERRED IN FAILING TO REQUIRE THAT CLAIMING PARTIES SHOULD NOT HAVE TO ELECT REMEDIES. THE PREVAILING PARTIES SHOULD NOT HAVE BOTH THE PROPERTIES AND DAMAGES.

C.  THE TRIAL COURT ERRED IN FAILING TO AWARD AN EQUITABLE LIEN TO THE KUCIK DEFENDANTS FOR THE MONEY PAID BY THEM FOR THE SUBJECT REAL PROPERTIES AND FOR SATISFACTION OF THE MORTGAGES OF THEM.

LEGAL ANALYSIS

A.  Did Appellees receive an unfair double-recovery?

{¶110} Because the arguments are related, we consider these assignments of error jointly. We begin, however, with consideration of assignment of error eight, Appellants' argument that the trial court should have required Appellees to elect a remedy.  Appellants argue it is unfair and amounts to a double recovery for Appellees to have had the properties restored to the Estate, along with compensatory and punitive damage awards.

{¶111} The doctrine of election of remedies states that the election of one remedial right bars pursuit of another when one right is inconsistent with the other and the election is made with "knowledge and intention and purpose to elect."  *Saunders v. Holzer Hospital Foundation*, 4th Dist. Gallia No. 08CA11, 2009-Ohio-2112, ¶ 19, quoting *Stowers v. Baron,* 65 Ohio App.2d 283, 285, 418 N.E.2d 404 (6th Dist. 1979), citing *Frederickson v. Nye,* 110 Ohio St. 459, 144 N.E. 299 (1924).

"Traditionally, one purpose of the doctrine of election of

remedies is to prevent double recovery and preclude a litigant

from pursuing a remedy that, in a previous action, he rejected in favor of an alternative an inconsistent remedy. Another purpose is to prevent needless experimentation with the remedies afforded by law. The prerequisites to application of the doctrine are: (1) the existence of two or more remedies; (2) the inconsistency of such remedies; and (3) a choice of one of them." *Saunders, supra*, at ¶ 19, quoting *Davis v. Rockwell Internatl. Corp.* (N.D. Ohio 1984), 596 F. Supp 780, 787 (citations omitted.)

This Court has recognized that the doctrine of election of remedies is considered a "'harsh and technical rule of procedure that is not favored in Ohio.'" *Saunders, supra,* at ¶ 20, quoting *Mac Tools, Inc. v. Administrator, Ohio Bureau of Employment Services,* 12th Dist. Fayette No. CA89-05-010 (Dec. 4, 1989), quoting *Davis,* supra, at 787. Simply put, "An election must be made because it is inconsistent to rescind [a] contract yet retain the benefits of it." *Jeffrey Mining Products, L.P. v. Left Fork Mining Company,* 143 Ohio App.3d 708, 758 N.E.2d 1173 (8th Dist. 2001).

{¶112} In *Bennice v. Bennice,* 82 Ohio App.3d 594, 598, 612 N.E.2d 1256 (6th Dist. 1992), the appellate court held:

"A suit for damages for fraud is inconsistent with rescission when such suit is founded on an affirmance of the contract. *Nye, supra,* at paragraph one of the syllabus; Annotation (1939) 120 A.L.R. 1154, 1155-1156. In turn, a suit for damages is founded on an affirmance of the contract 'only if, and in so far as, the damages sought to be recovered consist of the loss of the benefit of the bargain * * *.' Annotation, 120 A.L.R. at 1156; 37 American Jurisprudence 2d (1968) 527, Fraud and Deceit, Section 389. In such a case, the denial of damages after rescission is proper because, in view of the rescission, there are no damages. Annotation, 120 A.L.R. at 1158; 37 American Jurisprudence 2d, supra. The defrauded party may, however, recover damages other than the loss of the bargain, notwithstanding rescission. *Yeoman v. Lasley,* 40 Ohio St. 190, (1993), paragraph five of the syllabus; *Szatmary v. Miller,* 6 Ohio Law Abs. 693 (App. 1928); *Jones v. Draper, 4* Ohio C.C. (N.S. 105, 119-120 (1903), 16 Ohio C.D. 785; Annotation, 120 A.L.R. at 1159-1165; 37 American Jurisprudence 2d, supra."

**{¶113}** The Twelfth District Court of Appeals reiterated this principal in *Turner v. Paradise,* 12th Dist. Warren No. CA93-12-098, 1995 WL

321725 at *2, stating "A party may seek to have a transaction voided and at the same time seek damages caused by the fraudulent transaction." In this matter, we agree with Appellee that the rescission of the fraudulently conveyed deeds, along with the compensatory and punitive damages awards, were not inconsistent.

{¶114} To begin, the trial court noted in its judgment entry on post-trial motions (November 22, 2010) that the Kucik Defendants and Nickos, in arguing that the prevailing parties should not have been permitted to gain title to the subject real properties free and clear of mortgages that were paid by them and also should not have been permitted to have damages in addition to the properties, cited no authority for their position. Appellants again point to no authority and again fail to direct us to the place in the transcript where they complain error occurred. We observe the trial court gave the following instructions on damages to the jury:

"Four (4) damages: damages include the value of the asset transferred or the amount necessary to satisfy the claim of the Creditor, whichever is less. In addition, a person injured by a fraudulent transfer is entitled to such damages as will fairly compensate him for the wrong suffered. That is, the damages sustained by a reason of the fraud or deceit which have

naturally and proximately resulted from the Nickos Prokos and the Kucik Defendants conduct. Such damages may include any damages proven by the evidence which the circumstances may require."

The trial court further instructed that the Estate and Demetrios requested the properties transferred to the Kucik defendants be returned to the Estate. The trial court also gave jury instructions as to compensatory damages, lost profits, punitive damages, and attorney fees.

{¶115} The jury returned a verdict finding in favor of the Estate that the Appellants committed fraud. The jury awarded the Estate $49,000.00 in compensatory damages and $300,000.00 in punitive damages against Appellants on its claims for conversion and fraud. The jury also found in favor of Demetrios' claims for fraud and fraudulent transfers and awarded $5,000.00 on his claims for fraudulent transfers to avoid a creditor. The trial court's entry of May 27, 2010, further ordered that based upon the jury's findings of fraud, undue influence, lack of delivery, lack of capacity and self-dealing under the power of attorney granted to Nickos, that the deeds to the properties at issue were void and cancelled. The trial court directed that title to the properties be restored to the ownership of Laisa. We are not convinced these awards amount to a double-recovery.

**{¶116}** We do not know exactly how the jury determined these awards.  Based on the evidence it heard, Kucik paid approximately $313,000.00 for Laisa's 7 rental properties. The jury also heard evidence that the $49,000.00 which began as Laisa's money in Kucik's trust account traveled to Ohio to Attorney Biddlestone's trust account where it remained on her death.  The $49,000.00 was then routed to Kucik's personal account after she died.  The jury also learned that a $7,100.00 rental payment for Souvlakis was not made part of her Estate upon her death, and was distributed to Nickos after her death.  Fraud was determined to have occurred and fair consideration was not paid for the properties.  The $49,000.00 award was compensatory.  The jury may have concluded the $5,000.00 award was a lost rental profit belonging to Laisa's Estate.  We do not agree with Appellants that Appellees received an unfair double-recovery because Demetrios and the Estate received monetary damages and the properties were returned to the Estate.

B.  Should Appellees have received the properties free and clear
of the mortgages?

C.  Should Appellants have been awarded an equitable lien for
the money allegedly paid in satisfaction of the mortgages?

**{¶117}** Turning to Appellants' next arguments under assignments of error seven and fifteen, that they were entitled to an equitable award, it has

long been the rule in Ohio that one seeking equity must come to the court with clean hands. *Bradford v. Reid,* 126 Ohio App.3d 448, 710 N.E.2d 761 (1st Dist. 1998). This maxim denies all relief to one, no matter how well-founded his claim may otherwise be, if, "in granting the relief which he seeks, the court would be required, by implication even, to affirm the validity of an unlawful agreement or give its approval to the inequitable conduct on his part." *Reid* at 454, quoting *Kinner v. Lake Shore & Michigan S. Ry. Co.,* 69 Ohio St. 339, 344, 69 N.E. 614, (1904). "The inequitable conduct contemplated by the maxim must be 'reprehensible conduct with respect to the subject matter of his suit.'" *Reid* at 454*,* quoting *Kinner* at paragraph one of the syllabus. See, also, *Heskett Ins. Agency Inc., v. Braunlin*, 4th Dist. Ross No. 11CA3234, 2011-Ohio-6100, ¶ 18.

{¶118} Appellants also argue the Estate should not be permitted to gain title to the subject real properties free and clear of the mortgages that had been paid by the Kucik Defendants, and further, that the trial court erred in failing to award an equitable lien to the Kucik Defendants for the money paid by them for the properties and for the satisfaction of the mortgages. We would first reiterate that as to the money paid for the properties, again, the jury found Appellants committed fraud in obtaining the properties. The

clean-hands doctrine would bar them from receiving an equitable lien to reimburse them for money paid in obtaining the properties fraudulently.

{¶119} As to the alleged mortgage payments, only Barry Kucik testified that he had made mortgage payments. Kucik was forced to admit there is no documentation showing that he tried to assume the mortgages. Kucik testified he paid the mortgages and cured all defaults except on the property located at 9 W. State Street, yet he provided no documentation of payments made. The jury evaluated Kucik's testimony and credibility and apparently found it to be lacking. The jury also apparently found no reliable evidence that the mortgage payments were made. Appellants' brief points to no documentary evidence in the record to demonstrate payments were made. It would not be equitable to provide Appellants any credit for payments not proven to have been made.

{¶120} We have already discussed the case law on "credibility of the witnesses" and an appellate court's deference to the trial court's determinations. We rarely make further comment because ordinarily, witnesses' demeanor and credibility do not "come alive" while reading the literal words of a trial transcript. This case is different. At times, Nickos and Barry Kucik gave bizarre testimony. To assist in understanding the jury's verdict, we examine it more closely at this juncture.

{¶121} Barry Kucik's testimony at trial revealed: (1) his credentials were in question, (2) his ability to recall and testify to events was debatable; (3) his interactions with his client Laisa and the details of the real estate deals were suspect; (4) his perceptions as to his role as Laisa's advisor fluctuated, conveniently; and (5) his veracity was shown to be lacking. Kucik testified several days during the course of the 31-day trial and the jury received an overabundance of information to consider during their deliberations.

{¶122} Kucik admitted his letterhead indicated between the years 2003-2009 that he was a CPA, when in fact, he had not been a CPA since December 2003. Kucik claimed he was not made aware of this until 2009. Kucik admitted he had a disciplinary issue in Florida, relating to his advertising. He shifted the blame for this to his secretary, who according to him, set up his website and then overlooked his requests to change it.

{¶123} Kucik testified he had liver problems, blood problems, and blamed numerous health-related issues for his sloppy work and "poor decision-making." He also blamed an unverified health condition he described as "dyslexia of the brain" for his failure to recall events or testify accurately. Kucik testified this condition caused him to have difficulty concentrating, difficulty focusing, and caused his mind to "get mushy in the

afternoon." Yet, he indicated he still successfully practices law. Kucik admitted he was "sloppy" with documents he prepared because he was nervous and under stress. However, he further opined "[s]loppy doesn't mean you're a crook." Kucik even testified he was "joking around" in a prior deposition.[27]

{¶124} The testimony Kucik gave concerning his relationship with Laisa was also suspect. Kucik attempted to portray himself as a victim of poor decision-making and getting too personally involved with a client. Kucik clearly indicated he was able to observe Laisa's competence and was comfortable she understood the documents she signed. He actually testified she was "pretty sharp." He also testified he saw Nickos take good care of his mother. Kucik testified in purchasing the properties subject to the mechanics liens, he was taking a risk, but he felt a moral obligation to help Laisa. Her situation was "dark." He must have also felt some obligation to "help" Nickos and William Biddlestone as the testimony demonstrates he inexplicably paid both of them $5,000.00 a piece after Laisa's death. He testified the $5,000.00 to Nickos was a gift, to help pay for Laisa's funeral, and did not relate to the real estate deals. He also testified he, apparently out of the goodness of his heart, continued to loan Nickos money through the

---

[27] Kucik also testified he relied on his wife a lot in his law practice because she was a great writer. The testimony indicated Mrs. Kucik was a high school graduate.

fall of 2005. He was evasive as to whatever reason he had for paying Biddlestone $5,000.00.

{¶125} Yet Kucik also testified the purchase price for the whole deal was $575,000.00 and his testimony indicates Laisa received around $313,000.00 for 7 rental properties in an over-crowded college town. He provided money "behind the scenes." He testified he did not record the deeds because his "clients" wanted the deal kept secret and in particular, Laisa, was afraid that Demetrios would do something. Kucik testified that Nickos got the money and he [Kucik] got the deeds. He even drafted a contract in which Laisa directed that the last $100,000.00 be paid to Nickos even after her demise.

{¶126} Incredibly, Kucik testified that Laisa, (despite her age, lack of education, and lack of sophistication and familiarity with civil litigation), contacted him requesting to make the video to "state how she felt." Moreover, despite the fact that litigation was on-going, he failed to notify anyone that the video was being made. Kucik admitted that on the video, no one read the documents word-for-word to the interpreter nor did the interpreter read them word-for-word to Laisa. He further admitted the documents Laisa signed were not held up on the video, no one read them aloud, and thus, we do not know what she signed.

{¶127} Kucik's role as Laisa's attorney or advisor was not clear. Kucik testified he was not using his attorney or CPA skills when he prepared the agreement. He was "just a friend." The testimony showed he never sent any of the documents Laisa signed to her Ohio attorney for review and advice. Kucik testified he explained the deals to "them" (apparently Laisa and Nickos) and advised them he was not their attorney. He testified the documents might have been confusing, but "they" understood. This evidence would contradict earlier testimony that he was Laisa's attorney only, not Nickos'. The trial transcript also reflects Kucik's evasiveness when questioned as to whether or not he was in a position of trust with Laisa. He testified he did a lot of work for her, but did not think she viewed him as her lawyer. He was also evasive as to whether Laisa had waived counsel. The record reflects no waiver of counsel on file.

{¶128} Most telling was Kucik's admission that he and Nickos had been deceptive, misleading, and had, in essence committed a fraud on Nickos' prior attorney, Scyld Anderson. Kucik testified Anderson was working on a formal agreement and sent Nickos a letter advising him not to sign the deeds until the agreement was completed. In a prior 2007 deposition, Kucik testified Anderson prepared the agreement and sent it to Nickos who forwarded it to Kucik. Kucik signed the agreement and Nickos

sent it to Anderson.  However, Kucik did not want to sign the agreement and he and Nickos tore up the original agreement, while allowing Anderson to believe they considered it valid and enforceable.  Kucik explained that he did not want Nickos to lose his attorney and that was his purpose for misleading Anderson.  Kucik even apologized to the jury for his action in the matter.

{¶129} Kucik also denied receiving keys to the properties that the evidence indicated he did receive. When cross-examined as to why he did not truthfully complete, under penalty of perjury, the conveyance forms in the Athens County Auditor's office, thereby shortchanging the State of Ohio on fees collected, he explained he did not know all the mortgage information when filling out the forms and did so "to the best of his knowledge."  Kucik placed Laisa's $49,000.00 in his own personal account.  The evidence further demonstrated he tried to dupe an insurance company by giving them sketchy details about his ownership of the property.  Sandy Whitmore of Reed-Bauer Insurance Agency testified Kucik told her Laisa was the owner of a policy insuring 9 W. State Street.  Kucik signed a policy application as "Barry Kucik, Trustee" yet the company thought they were re-writing the policy for Laisa.  Kucik faxed the company an unrecorded warranty deed.

When the company found out Kucik claimed an interest, the policy was cancelled.

{¶130} The evidence also suggested that Barry Kucik was closely aligned with Nickos. Nickos' cell phone records indicated many calls between Nickos and Kucik. Nickos attempted to portray himself as the "only son" or "golden son," devoted caretaker, now with his own health issues, who sacrificed his personal life and was unable to hold down a job due to caring for his parents. At the time of trial, Nickos had had his pancreas removed. He had been in a coma and on life-support prior. He took 32 pills a day for depression and other health issues. He testified his medications affected his ability to recall and testify. The evidence adduced from his testimony likely led the jury to conclude that Nickos was spoiled, untrustworthy, irresponsible, domineering, and flamboyant. Nickos testified about his relationship with his parents and other family, the real estate deals with Kucik, and his personal life.

{¶131} Nickos testified he had tension with Demetrios from childhood. He testified Demetrios had "ripped him off," owed him $200,000.00, and they had not spoken since 1998. His testimony portrayed Demetrios as a villain who terrorized his mother about the rental properties after his father's death and would not let the parents be buried together.

Nickos testified he helped his parents because they were always short of money.  He described his mother was strong-willed, extremely sharp, and she "wore the pants in the family." After Vasilios died, he assisted his mother and was privy to her accounts. He reviewed statements, wrote checks, transferred money, paid for household expenses and made mortgage payments.  He testified to paying for utilities, condominium dues, meals, cars, caregivers, and his mother's Sam's Club expenses.  Despite this testimony, there was no documentary evidence presented that showed Nickos had paid any of his parents' bills with his own money.  And also, despite his testimony as to his care and involvement with his parents, Nickos admitted he did not know what happened to the cars his father had owned in Florida at the time of his death.

{¶132} The testimony indicated Nickos had always lived a "cushy" life, thanks to the assistance of his parents and Pam.  He had been in the mortgage business at one time, however he claimed he did not know the difference between a quitclaim deed and a warranty deed.  Nickos filed bankruptcy in 2001, yet he was forced to admit he had never reported the $200,000.00 debt allegedly owed by Demetrios, to the bankruptcy court.  Nickos also testified he had been in the car business and that lots of his clients were local professional football players.  Nickos had 6 cell phones

which he explained were necessary for his mother, her friends, and

caregivers.  Yet he also had them a year after she died.[28]

{¶133} Nickos testified they found Kucik on the internet and thought

he looked like a good attorney.[29]  Nickos did not know about Kucik's CPA

licensing problems until during the trial.  He testified to knowing Kucik was

forgetful and had dyslexia of the brain or mouth, but he did not know at the

time he allowed Kucik to represent his mother.  Nickos testified he thought

the transactions with Kucik were fair, and Kucik was not taking advantage

of his mother.

{¶134} Regarding the second real estate deal, Nickos testified his

mother wanted Kucik to pay him the last $100,000.00 for all the years of his

caring for them and "not going on with his life."  He also testified she

wanted the deal kept secret.  Nickos' testimony showed the day Laisa died,

he left the deeds in Kucik's office, and in one version of his story, left them

under the door.  The deeds were later returned to Nickos, due to multiple

mistakes.  Nickos did not recall prior testimony about changing the deeds by

using his typewriter.  However, he may have done so.  Nickos testified he

had typed information onto car titles in the past and it was "no big deal."

---

[28] The evidence also showed he paid Thomas Mandros' ( Alieke's husband's) cell phone bill. He also testified at one point that Thomas Mandros had recommended Kucik.

[29] The evidence also indicated Kathy Kucik and Laisa visited the same doctor's office for approximately 3 years prior to Laisa's death.

{¶135} Nickos explained away some of the discrepancies in his testimony by stating that some of his testimony had been over 4 years prior to trial and he was on a lot of anti-depressants. Nickos testified he was doing his best to answer truthfully. Nickos denied sequestering his mother from the rest of her family. However, despite medical records which indicated otherwise, Nickos denied knowing his mother was near death on the day he transferred her last 4 properties to Kucik using the power of attorney she had given him. Nickos incorrectly testified as to the last year he had filed taxes. He admitted he had not notified the IRS of the real estate deals. And he was shown to be lying when he testified he paid his mother's funeral bill and then admitted on cross-examination he had paid only a portion of the bill.

{¶136} Nickos admitted he had been investigated by the FBI. He testified he had a "weave" like the famous actors have, which required expensive maintenance twice a month. After his parents died, he became a priest via a website course. He testified he needed to "find himself" after his parents died. He testified to working in a homeless ministry in Florida.

{¶137} As such, we find no merit to Appellants' arguments that the trial court erred by permitting the court to consider inconsistent remedies, returning the properties to the Estate, or failing to award an equitable lien to

Appellants for money paid to purchase the properties or pay the mortgages.

Appellants did not come to the transactions with Laisa with clean hands.

Accordingly, we overrule assignments of error seven, eight, and fifteen.

VII.  <u>Assignment of Error Ten – The trial court erred in permitting the estate fiduciary Jeff Finley to proceed in trial as if he had not denied the validity of the mechanic's liens claims of the plaintiff Demetrios Prokos in his pleadings, which he had, thereby giving the jury the false impression that the estate was in agreement with the claims of Demetrios Prokos as well as in agreement with the validity of the mechanic's liens.</u>

## LEGAL ANALYSIS

{¶138} Appellants essentially argue it was error for Jeff Finley, the fiduciary, to proceed in trial as if he had not previously denied the validity of the mechanics' lien.  This assignment of error has no merit for several reasons.  First, Appellants fail to cite testimony to support their assertion that Jeff Finley's testimony misled the jury, as required by App.R. 12(A)(2).  Second, as required by App.R. 16(A)(7), Appellants fail to cite any case law or other statutory authority to support their argument.  Finally, Appellants have completely mischaracterized Finley's testimony.

{¶139} Despite Appellant's failure to cite to testimony, a review of the trial transcript demonstrates Finley testified he was the fiduciary of Laisa Prokos' estate, appointed in May 2007.  As fiduciary, one of his objectives was to get the properties at issue returned to the Estate.  Finley testified he is on opposing sides from the other parties on some issues, but not all.

Importantly, he testified Laisa originally opposed the mechanic's liens and had sued Demetrios. Finley had filed claims on behalf of the estate to have the mechanics' liens declared invalid. He made it clear he was prosecuting the action to set aside the liens. Therefore, he was opposing Demetrios' claims because he opposed the liens. He also reiterated in his testimony the liens had to be proven. There can be nothing misleading about this testimony, and we cannot see it gave the jury a false impression that the Estate was aligned with Demetrios or otherwise prejudiced the Kucik Defendants. For the foregoing reasons, we find this assignment of error to be without merit and it is, likewise, overruled.

VIII. Assignment of Error Fourteen – The trial court erred in failing to decide by clear and convincing evidence, independently of the jury, (which only made decisions by a preponderance of the evidence), that the transfers of the subject real properties had been nullified, for any reason or by reason of the jury's interrogatories.

{¶140} When reviewing judgments granting equitable relief, we must determine whether the trial court abused its discretion. *Muskingum Valley v. Tonti,* 4th Dist. Washington No. 95 CA 31, 1997 WL 214798. In *State v. West,* 66 Ohio St.3d 508, 513, 613 N.E.2d 622 (1993) (Moyer, C.J., concurring in judgment only), Chief Justice Moyer explained the nature of equity jurisdiction and the reasoning behind the application of the abuse of discretion standard of review in equity cases as follows:

"Decisions requiring equitable balancing should not be based solely on the cold appellate record. Trial judges are far more able than appellate courts to fairly balance equities. That, of course, is why we generally use an 'abuse of discretion' standard in reviewing decisions on equitable claims and defenses in the trial courts. See, e.g., *Joseph J. Freed & Assoc., Inc., v. Cassinelli Apparel Corp,* 23 Ohio St. 3d 94, 491 N.E.2d 1109 (1986). While we are able to judge whether a trial court abused its discretion in making an equitable judgment, we are not in place to make those judgments ourselves."

We have discussed the "clean hands doctrine" at length above. On this doctrine, the United States Supreme Court has also stated:

"* * *The governing principle is 'that whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.' * * * 'he who asks [for] relief must have acted in good faith. The equitable powers of this court can

never be exercised on behalf of one *who has acted fraudulently*

* * *.'" *Yoder v. Yoder*, 3rd Dist. Wyandot No. 16-03-14,

2004-Ohio-2475,¶ 13; quoting *Keystone Driller Co. v. General*

*Excavator Co.,* 290 U.S. 240, 244-245, 54 S. Ct. 146, (emphasis

added, citations omitted.).

**{¶141}** Appellants argue the trial court erred in failing to decide by

clear and convincing evidence, that the transfer of the properties had been

nullified. Appellants apparently argue the trial court abused its discretion in

making its decision to rescind the deeds for any reason or by reason of the

jury's interrogatories. We cannot agree.

**{¶142}** The Estate and Demetrios sought monetary damages and

equitable relief by way of rescission of the deeds. On the equitable claims,

the jury answered interrogatories. The trial judge had discretion and

authority to render the equitable relief it did in its May 27, 2010 judgment

entry. The jury answered interrogatories and the trial court's entry sets forth

these findings in its entry as follows:

> "Four interrogatories were further answer(sic) by the Jury. In
> the first and second interrogatories, the Jury concluded that on
> April 20, 2005, that Laisa Prokos did not have an intention to
> make the Warranty Deeds for the Athens, Ohio properties (208
> W. Washington Street, 9 W. State Street and 186 W.
> Washington Street) immediately operative to transfer the legal
> title, ownership or and the right of possession of the subject
> property to Barry Kucik and Kathy Kucik as Trustees of the

Kucik Revocable Living Trust dated March 21, 2005. The Jury further found, in connection with the same purported conveyance, that Laisa Prokos did not have an intention to presently, immediately, and unconditionally transfer title to the real estate described in the Warranty Deeds. Additionally, the Jury found there was no relinquishment of ownership, dominion and control over the properties by Laisa Prokos, no acceptance by Barry Kucik, as Trustee of the Kucik Trust, and there was failure of a mutual intention of both parties to immediately transfer title. The Jury concluded that this was due to fraud and undue influence committed by Barry Kucik, either individually or as Trustee of the Kucik Trust; fraud and undue influence committed by Nickos Prokos; and due to Laisa Prokos' lack of capacity.

In the third interrogatory, the Jury concluded that on June 29, 2005, that Laisa Prokos, by and through her attorney-in-fact Nickos Prokos, did not have an intention to make the Quit-Claim Deeds for the properties located at 6 Brown Avenue, 120 N. Congress Street, 48 Moore Avenue, and 45 Brown Avenue immediately operative to transfer the legal title, ownership of and the right of possession of the subject property to Barry Kucik. The Jury further found, in connection with the same purported conveyances, that Laisa Prokos, by and through her attorney-in-fact Nickos Prokos, did not have an intention to presently, immediately, and unconditionally transfer title to the real estate described in the Quit-Claim Deeds. Additionally, the Jury found that there was no relinquishment of ownership, dominion and control over the properties by Laisa Prokos, no accept ace by Barry Kucik, and there was no mutual intention of both parties to immediately transfer title. The Jury concluded that this was due to fraud and undue influence committed by Barry Kucik; fraud and undue influence committee by Nickos Prokos; due to Laisa Prokos' lack of capacity and that Nickos Prokos had engaged in no-authorized self-dealing under the Power of Attorney."

{¶143} In this case, after six weeks of testimony and the review of

hundreds of exhibits, the trial court concluded fraud had occurred. And, there is competent, credible evidence to support the jury's verdict. The trial judge also heard this evidence and reviewed the jury's answers to interrogatories. Based upon the evidence, Appellants did not come to the table with "clean hands." We do not find the trial judge abused his discretion in making an equitable award of rescission of the deeds to the Estate of Laisa Prokos. As such, Appellant's assignment of error is without merit and is accordingly, overruled.

CONCLUSION

{¶144} Based on our review of the record, we affirm the judgment of the trial court. As such, we hereby overrule all of Appellants' assignments of error.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and that the Appellees recover of Appellants costs herein.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J.:    Concurs in Judgment and Opinion.
Hoover, J:     Concurs in Judgment and Opinion as to Assignments of Error I, III, IV, V, VI, VII, VIII, IX, X, XIV, XV; Concurs in Judgment Only as to Assignments of Error II, XI, XII, XIII, XVI, XVII, and XVIII.

For the Court,


BY:    _____
       Matthew W. McFarland, Judge



## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**